IN THE SUPREME COURT OF NORTH CAROLINA

No. 294PA14

Filed 27 January 2017

ROBERT E. KING and wife, JO ANN O'NEAL

v.

MICHAEL S. BRYANT, M.D. and VILLAGE SURGICAL ASSOCIATES, P.A.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 235 N.C. App. 218, 763 S.E.2d 338 (2014), affirming an order entered on 10 May 2013 by Judge Lucy N. Inman in Superior Court, Cumberland County. After hearing oral argument on 18 May 2015 and receiving additional findings of fact following the entry of a remand order on 19 February 2016, the Court ordered the parties to submit supplemental briefs. Additional issues raised in the supplemental briefs heard on 31 August 2016.

*Beaver, Courie, Sternlicht, Hearp & Broadfoot, P.A., by Mark A. Sternlicht, for plaintiff-appellees.*

*Walker, Allen, Grice, Ammons & Foy, L.L.P., by Robert D. Walker, Jr., O. Drew Grice, Jr., and Alexandra L. Couch, for defendant-appellants.*

*Zaytoun Law Firm, PLLC, by Matthew D. Ballew, and Patterson Harkavy LLP, by Burton Craige, for North Carolina Advocates for Justice, amicus curiae.*

ERVIN, Justice.

This case arises out of a medical malpractice action that plaintiffs, Robert E. King and his wife, Jo Ann O'Neal, brought against defendants, Michael S. Bryant, M.D., and Village Surgical Associates, P.A. According to the allegations contained in

plaintiffs' complaint, Mr. King was scheduled to undergo a bilateral inguinal hernia repair to be performed by Dr. Bryant at the Fayetteville Ambulatory Surgery Center on 14 May 2009. At the time of his initial appointment with Dr. Bryant, Mr. King was presented with an Agreement to Alternative Dispute Resolution (arbitration agreement) that defendants routinely presented to new patients along with other documents prior to the first occasion on which a patient met with a physician. The arbitration agreement provided that:

> **In accordance with the terms of the Federal Arbitration Act, 9 USC 1-16, I agree that any dispute arising out of or related to the provision of healthcare services by me, by Village Surgical Associates, PA, or its employees, physician members, and agents shall be subject to final and binding resolution through private arbitration.**
>
> The parties to this Agreement shall agree upon three Arbitrators and at least one arbitrator of the three shall be a physician licensed to practice medicine and shall be board certified in the same specialty as the physician party. The remaining Arbitrators either shall be licensed to practice law in NC or licensed to practice medicine in NC. The parties shall agree upon all rules that shall govern the arbitration, but may be guided by the Health Care Claim Settlement Procedures of the American Arbitration Association, a copy of which is available to me upon request. I understand that this agreement includes all health care [sic] services which previously have been or will in the future be provided to me, and that this agreement is not restricted to those health care [sic] services rendered in connection with any particular treatment, office or hospital admission. I understand that this agreement is also binding on any individual or entity and not a precondition to receiving health care [sic] services.

Mr. King, a witness, and Dr. Bryant each signed the arbitration agreement on 29 April 2009.

According to the unchallenged findings of fact, a front desk employee at Village Surgical Associates provided Mr. King with several intake forms to complete and sign while he waited to meet Dr. Bryant. The initial intake forms asked Mr. King to provide personal and medical history information and to sign the signature lines on all of the forms, including the arbitration agreement. Mr. King stated in his affidavit that he was then provided with a second set of documents, which addressed insurance and payment-related issues, after he had met with Dr. Bryant. Mr. King acknowledged that he did not read any of the documents that he signed after his initial meeting with Dr. Bryant and stated that he had believed them to be "just a formality." Mr. King denied having received a copy of the arbitration agreement on the day that it was signed and asserted that the contents of the agreement were not clear to him even after he had read it. Mr. King contended that, "[i]f the agreement had been brought to my attention and I had been told signing it was optional, I would not have signed it."[1]

In the course of the performance of the hernia repair procedure, Dr. Bryant injured Mr. King's distal abdominal aorta, resulting in abdominal bleeding. Although

---

[1] Plaintiffs have not complained about, much less challenged the validity of, any of the other documents that Mr. King signed during his visit to the Village Surgical Center on 29 April 2009. The identity and contents of these documents are not clear from the record.

Dr. Bryant was able to repair Mr. King's injury, the necessary remedial procedures led to occlusion of an artery, a thromboembolism to Mr. King's right lower leg, and acute ischemia in Mr. King's right foot. After undergoing the performance of an immediate revascularization at Cape Fear Valley Health Systems for the purpose of salvaging his right leg, Mr. King remained hospitalized until 26 May 2009. At the time of his discharge, Mr. King continued to suffer from complications related to his abdominal aortic injury and needed additional treatment. As a result of the injury that he sustained during the hernia repair procedure, Mr. King incurred unexpected medical expenses, abdominal scarring, lost wages, numbness, and a limited ability to use his right leg and foot.

On 28 September 2011, plaintiffs filed a complaint against defendants in the Superior Court, Cumberland County, seeking damages for medical malpractice. On 7 November 2011, defendants filed a motion seeking to have further litigation in this action stayed and the arbitration agreement that had been entered into between Mr. King and defendants enforced and an answer in which defendants denied the material allegations of plaintiffs' complaint. Plaintiffs responded to defendants' motion to stay and enforce the arbitration agreement by arguing that:

> [T]he purported agreement is not enforceable for reasons that include but are not limited to the undue, prohibitive financial burden that enforcement of the agreement would have on plaintiffs by requiring the hiring of three arbitrators, one who must be a board certified physician in the same specialty as the defendant, Michael S. Bryant, M.D., and two who must be attorneys or physicians

licensed in North Carolina; the inherent unfairness of requiring one arbitrator be a member of the same profession and medical specialty as the defendant, . . . especially in light of the absence of any comparable requirement for an arbitrator to be similarly affiliated with the plaintiffs . . . .

On 13 February 2012, defendants filed a motion seeking the entry of an order compelling arbitration. On 23 March 2012, the trial court entered an order denying defendants' motion to enforce the arbitration agreement on the basis of conclusions that:

> 4.   The Agreement to Alternative Dispute Resolution leaves material portions open to future agreements by providing, *inter alia*, that the parties shall agree upon three arbitrators and that the parties shall agree upon all rules that shall govern the arbitration.
>
> 5.   At most, the Agreement to Alternative Dispute Resolution is an "agreement to agree" that is indefinite and depends on one or more future agreements. *Seawell v. Continental Cas. Co.*, 84 N.C. App. 277, 281, 352 S.E.2d 263, 265 (1987).
>
> 6.   The Agreement to Alternative Dispute Resolution is not a binding contract and is not enforceable.

Defendants noted an appeal to the Court of Appeals from the trial court's order.

On 5 February 2013, the Court of Appeals filed an opinion reversing the March 2012 order and remanding this case for further proceedings, *King v. Bryant*, 225 N.C. App. 340, 737 S.E.2d 802 (2013) (*King I*), on the grounds "that the trial court erred in concluding the Agreement between the parties was too indefinite to be enforced," *id.* at 345, 737 S.E.2d at 807. According to the Court of Appeals, "there was clearly an

offer to arbitrate any dispute which arose out of Defendants' provision of medical care, as well as an acceptance of that offer by Mr. King." *Id.* at 346, 737 S.E.2d at 807. Although plaintiffs had argued before the trial court and the Court of Appeals that the arbitration agreement was unenforceable on unconscionability grounds, the Court of Appeals declined to address that issue given that the trial judge in the March 2012 order had not made the necessary factual findings. *Id.* at 347, 737 S.E.2d at 808. According to the Court of Appeals, "the trial court is the appropriate body to determine whether the agreement is unconscionable," *id.* at 347-48, 737 S.E.2d at 808 (citation omitted), with the needed unconscionability analysis to "be undertaken with an understanding of the unique nature of the physician/patient relationship," *id.* at 348, 737 S.E.2d at 808. In addition, the Court of Appeals noted that, "[u]nder North Carolina law, fiduciary relationships create a rebuttable presumption that the plaintiff put his trust and confidence in the defendant as a matter of law." *Id.* at 349, 737 S.E.2d at 809. As a result, the Court of Appeals required that these issues be addressed on remand. *Id.* at 350, 737 S.E.2d at 809.

On 10 May 2013, the trial court entered an order on remand determining that, given the nature of the fiduciary relationship that existed between Mr. King and defendants, defendant Bryant "had a fiduciary duty to disclose to his patient all facts material to their transaction." More specifically, the trial court's May 2013 order found as a fact that:

2.     Mr. King, now 68, has no educational degree beyond high school and his job requires little reading.  He has minimal experience reading legal documents.

3.     Defendant Village Surgical Associates, P.A. ("Village Surgical") has experience in managing patient complaints, responding to claims of medical negligence made by patients, and resolving disputes through arbitration.

4.     On April 29, 2009, Plaintiffs visited Defendant's office for the first time to consult with Defendant Bryant about performing laparoscopic surgery on Plaintiff King to repair a hernia.  Plaintiff King had been referred to Defendants by his primary care physician.

5.     While Plaintiffs were waiting to meet Defendant Bryant and consult with him about performing surgery, Defendant's receptionist provided Plaintiff King with several intake forms to complete and sign.  Plaintiff King considered the forms to be a formality.

6.     Neither the receptionist, nor Defendant Bryant, nor any agent of Defendants called to Plaintiff King's attention the fact that one of the forms he was asked to sign, the Agreement, differed from all of the other forms because it did not concern medical information, insurance information, or payment for the surgery, all routine for a new patient.  Nor did anyone disclose to Plaintiff King that the Agreement sought to foreclose his access to the judicial process in the event that any dispute arose out of or related to the surgery to be performed by Defendant Bryant.

. . . .

8.     The Agreement does not provide that by signing it, the patient waives his or her right to a trial.  The Agreement does not include the word "jury" or "judge" or "trial."  The Agreement does not provide that the patient can consult an attorney before signing it.

9. There is no evidence that the physician or any agent of Defendants discussed with the patient, Plaintiff King, any provision of the Agreement.

. . . .

11. At the time Plaintiff King signed the Agreement and provided his medical information on intake forms, even though he had not yet met Defendant Bryant, he was already placing his confidence and trust in Defendants, as demonstrated by his willingness to share his confidential medical information.

. . . .

14. The first, bold-faced paragraph of the Agreement is poorly drafted, confusing, and nonsensical. For example, it refers to the "provision of healthcare services by me," suggesting that "me" refers to the physician rather than the patient.

15. The Agreement repeatedly refers to arbitration without defining the term. The Agreement includes no mention whatsoever of the judicial process, a trial, or a jury. The Agreement does not disclose Defendants' intent for Plaintiff King to waive his rights to the judicial process, including his right to a jury trial, in the event of any claim arising from or related to the surgery. A person of Plaintiff King's education and experience should not reasonably have been expected to know from the language of the Agreement, or from any information provided to him by Defendants, that he had a right to a jury trial to resolve any potential dispute with his surgeon. Nor should he have been expected to understand from the language of the Agreement or other information provided to him by Defendants that by signing the Agreement, he would waive his right to a jury trial.

16. The last sentence of the second paragraph in the Agreement starts with complex but complete clauses . . . and ends with an incomplete clause . . . . A person of

Plaintiff King's education and experience should not reasonably be expected to understand the last, tacked on, incomplete clause to mean that he did not need to sign the Agreement in order for Defendant Bryant to perform the surgery.

17.     Plaintiff King read the Agreement after a copy was provided to him by his attorney, and he still did not understand its contents or the intended consequence of signing it.

18.     Unlike arbitration agreements which have been upheld and enforced in medical negligence cases, the Agreement includes no provision allowing or recommending that the patient consult with an attorney regarding the Agreement prior to signing it.

19.     Defendants sought Plaintiff's signature on the Agreement to benefit themselves.

20.     The Agreement's provision requiring at least one physician arbitrator, and its provision allowing all three arbitration panelists to be a physician, confers a benefit to Defendants and detriment to Plaintiffs.

. . . .

23.     Ms. Ramos, a receptionist at Defendant Village Surgical, states in a sworn affidavit that the form arbitration agreement is included in "registration paperwork" presented to each new patient when he or she visits the practice for an initial appointment, prior to meeting with a physician. . . . It is reasonable to infer from Ms. Ramos' sworn statement that, in fact, it is the practice of Defendants to obscure the form arbitration agreement by presenting it among a pile of other documents without pointing it out or explaining its contents.

Based upon these findings of fact, the trial court concluded as a matter of law in the

May 2013 order that:

      3.     Defendants were fiduciaries of Plaintiff King as the result of the physician-patient relationship.

      4.     Defendant Bryant and other agents of Defendants breached their fiduciary duties to Plaintiff King by failing to disclose to him all material terms of the Agreement and failing to deal with him openly, fairly, honestly, and without imposition, oppression, or fraud in procuring his signature on the Agreement.

. . . .

      6.     The Agreement is the product of constructive fraud and is therefore unenforceable.

      7.     The Agreement is unconscionable and is therefore unenforceable.

Defendants noted an appeal to the Court of Appeals from the trial court's May 2013 remand order declining to enforce the arbitration agreement.

On 15 July 2014, the Court of Appeals filed an unpublished opinion affirming the May 2013 remand order on unconscionability grounds. *King v. Bryant*, 235 N.C. App. 218, 763 S.E.2d 338, 2014 WL 3510481 (2014) (unpublished) (*King II*). Although defendants had argued on appeal that the arbitration agreement was "not a product of constructive fraud and not unconscionable" and that the trial court had "erred by denying their motion to compel arbitration," *King II*, 2014 WL 3510481 at *2, the Court of Appeals noted that "[d]efendants do not argue that the trial court's findings of fact are not based on competent evidence," *id.* at *6, making the trial court's findings "binding on appeal," *id.* at *6 n.1. In addition, the Court of Appeals declined to address defendants' contention that "a fiduciary relationship did not exist at the

time that Mr. King signed the arbitration agreement because [Dr. Bryant] had not yet accepted King as a patient," *id.* at *6, given that the Court had already decided in *King I* "that a fiduciary relationship existed between the parties and directed the trial court to consider that fact on remand," *id.* (citing *N.C. Nat'l Bank v. Va. Carolina Builders*, 307 N.C. 563, 567, 299 S.E.2d 629, 631 (1983) (concluding that, "once a panel of the Court of Appeals has decided a question in a given case that decision becomes the law of the case and governs other panels which may thereafter consider the case")).

Upon reaching the unconscionability issue, the Court of Appeals noted this Court's holding in *Tillman v. Commercial Credit Loans, Inc.*, to the effect that, although

> [a]rbitration is favored in North Carolina. . . . "equity may require invalidation of an arbitration agreement that is unconscionable." A court will find a contract to be unconscionable "only when the inequity of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other."

362 N.C. 93, 101-02, 655 S.E.2d 362, 369-70 (2008) (internal citations omitted) (quoting *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002), and *Brenner v. Little Red Sch. House Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981)). "A party asserting that a contract is unconscionable must

prove both procedural and substantive unconscionability." *Id.* at 102, 655 S.E.2d at 370 (citations omitted). However,

> [s]ince *Tillman*, the United States Supreme Court has issued two important opinions on the use of state law to set aside an arbitration agreement when that agreement is governed by the FAA: *AT&T Mobility v. Concepcion*, ___ U.S. ___, 179 L.Ed.2d 742 (2011) (determining that the FAA preempted California's judicial rule prohibiting class waivers in consumer arbitration agreements contained within contracts of adhesion) and *American Express Co. v. Italian Colors Rest.*, ___ U.S. ___, 186 L.Ed.2d 417 (2013) (holding that the FAA does not permit courts to invalidate an arbitration agreement on the grounds that it does not permit class arbitration).

*King II*, 2014 WL 3510481, at *8. The Court of Appeals had addressed the impact of *Concepcion* and *Italian Colors* on *Tillman* in *Torrence v. Nationwide Budget Finance*, 232 N.C. App. 306, 753 S.E.2d 802, *disc. rev. denied and cert. denied,* 367 N.C. 505, 759 S.E.2d 88 (2014), and stated that, "[w]hile both *Concepcion* and *Italian Colors* dealt with class action waivers, underlying those decisions was a broader theme that unconscionability attacks that are directed at the arbitration process itself will no longer be tolerated." *Torrence*, 232 N.C. App. at 321, 753 S.E.2d at 811 (citation omitted). As a result, in *Torrence*, the Court of Appeals held that "(1) the 'prohibitively high' cost factor is no longer applicable to an unconscionability analysis; (2) an agreement's lack of mutuality, alone, is not sufficient to justify a finding of substantive unconscionability; and (3) the prohibition of joinder of claims and class

actions does not render an arbitration agreement unconscionable." *King II*, 2014 WL 3510481 *8 (citing *Torrence*, 232 N.C. App. at 322, 753 S.E.2d at 811-12).

In spite of the limitations on the use of state law to preclude enforcement of arbitration agreements noted in *Torrence*, the Court of Appeals concluded that "the trial court correctly determined that the arbitration agreement here is unconscionable," *id.*, given defendant's failure to take "any *active* steps, in accordance with their fiduciary duty, to make a full, open disclosure of material facts to King before he signed the arbitration agreement," *id.* at *9 (internal quotations marks omitted). The Court of Appeals concluded that the arbitration agreement is procedurally unconscionable because,

> [g]iven (1) the fact that we analyze the agreement here in the context of the fiduciary duty Defendants owed King, (2) the disparate levels of sophistication between the parties, (3) the nature of the delivery of the agreement, and (4) *Defendants' burden* because of their fiduciary duty to King to provide full and open disclosure of the material facts surrounding the transaction between the parties, we hold that the arbitration agreement suffered from significant procedural unconscionability. King did not have a meaningful choice between whether to sign the agreement or not. Accordingly, Defendants' argument is overruled.

*Id.* at *10. Similarly, the Court of Appeals found the arbitration agreement to be substantively unconscionable because it is "a harsh, one-sided and oppressive instrument." *Id.* As a result, after concluding that "this agreement is unconscionable because of Defendants' failure to properly prepare and present the arbitration

agreement to King in the context of their confidential, physician-patient, fiduciary relationship," *id*. at *11, the Court of Appeals affirmed the remand order, *id*.

On 18 August 2014, defendants filed a petition for discretionary review requesting this Court to grant further review of the Court of Appeals' decision in *King II*. On 18 December 2014, this Court granted defendants' discretionary review petition. After briefing and oral argument, this Court entered an order on 21 August 2015 remanding this case to the Superior Court, Cumberland County, for the making of further findings of fact relating to the issue of whether a physician-patient relationship existed at the time that Mr. King signed the arbitration agreement on the grounds that both the trial court's May 2013 remand order and the Court of Appeals decision in *King II* had "assumed the existence of such a relationship" and that the record was devoid of sufficient findings to permit the proper resolution of this case in the absence of such findings.

On 6 November 2015, Judge Mary Ann Tally entered an order on remand making the factual findings requested in this Court's remand order. In the November 2015 order, the trial court found as fact that:

> 5. When Mr. King completed the forms by providing his confidential medical history, symptoms, personal identifying information, and health insurance [ ] information, and signing the arbitration agreement, he trusted Dr. Bryant as his doctor, Dr. Bryant's practice, and its employees, particularly because of the referral from his family doctor. Mr. King would not have provided private and confidential information and signed the documents,

including the arbitration agreement, if he had not considered Dr. Bryant to be his doctor and trusted him.

6.      Patient trust is fundamental to the physician-patient relationship.    The requirements of that relationship include adequate communication between the physician and patient; there be no conflict of interest between the patient and the physician; personal details of the patient[']s life shared with the physician be held in confidence; there be respect for the patient's autonomy; patient primacy; and selflessness.  These requirements are described in the North Carolina Medical Board Position Statement, *The physician-patient relationship*.   Each of these requirements applied to the relationship between defendants and Mr. King.

7.      Each of those requirements arose because a physician-patient relationship existed between defendants and Mr. King. . . .  [A] physician-patient relationship can exist before a physician meets a patient, particularly when the physician delegates to others certain duties that are involved in the relationship, even though this may "not fit traditional notions of the doctor-patient relationship." *Mozingo v. Pitt Cnty. Mem. Hosp., Inc.*, 331 N.C. 182, 188, 415 S.E.2d 341, 344-45 (1992).  These cases support the fact that a physician-patient relationship can exist when a physician has fewer than all of the duties that attach to the relationship after the duty to treat arises or when a physician, in today's modern health care environment, relies on others to participate in activities necessary for patient care.

8.      By analogy, the [a]ttorney-client privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390, 394 (1981).

9.      The physician-patient relationship began before Mr. King signed the arbitration agreement and was

> in existence at the time he signed the arbitration agreement.

After receiving these additional findings of fact concerning the physician-patient relationship issue, this Court ordered supplemental briefing and argument. In their supplemental brief, defendants urge us to "disregard the findings of fact entered by the trial court, find that no physician-patient relationship existed at the time Mr. King signed the arbitration agreement, and reverse the decision of the Court of Appeals affirming the trial court's order on the grounds that the arbitration agreement is unconscionable." Plaintiffs, on the other hand, argue that the findings contained in the November 2015 order establish that a physician-patient relationship existed when Mr. King signed the arbitration agreement, so that "this Court should affirm the holdings that the Agreement is unenforceable due to constructive fraud and unconscionability."

Although they have vigorously challenged the legal effect of the factual findings contained in the May 2013 and November 2015 orders, defendants have not challenged the sufficiency of the evidence to support any of those findings. According to well-established North Carolina law, "[w]here no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citing, *inter alia*, *Schloss v. Jamison*, 258 N.C. 271, 275, 128 S.E.2d 590, 593 (1962)). However, defendants do argue that the findings of fact fail to support

the conclusions of law to the effect that "[d]efendants were fiduciaries of Plaintiff King as the result of the physician-patient relationship" and that "[t]he Agreement is unconscionable and is therefore unenforceable." Unlike findings of fact, "[c]onclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004) (citations omitted). As a result, we will review defendants' challenges to these conclusions of law using a de novo standard of review.

After carefully considering the record and the briefs and arguments submitted by the parties, we believe that the proper resolution of this case hinges upon the nature of the relationship that existed between Mr. King and Dr. Bryant at the time that the arbitration agreement was signed. Although the parties, especially in their supplemental briefs, have placed particular emphasis upon the issue of whether a physician-patient relationship could have existed between Mr. King and Dr. Bryant before Dr. Bryant met with and accepted Mr. King as a patient, we are not, after extensive reflection, convinced that this case is properly viewed through a physician-patient relationship lens. Instead, we believe that this case is most properly understood as revolving around the issue of whether a fiduciary relationship existed

between Mr. King and Dr. Bryant independent of the existence of a physician-patient relationship at the time that Mr. King signed the arbitration agreement.[2]

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citing *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984), and *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971)). "The courts generally have declined to define the term 'fiduciary relation' and thereby exclude from this broad term any relation that may exist between two or more persons with respect to the rights of persons or property of either." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). "In general terms, a fiduciary relation is said to exist [w]herever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Vail v. Vail*, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951) (internal quotation marks omitted).

A number of relationships have been held to be inherently fiduciary, including the relationships between spouses, attorney and client, trustee and beneficiary, members of a partnership, *Dallaire v. Bank of America, N.A.*, 367 N.C. 363, 367, 760

_____

[2] Defendants have never contended at any point in this litigation that the breach of fiduciary duty issue, which was clearly discussed in the trial court and raised before the Court of Appeals during the proceedings that led to *King II*, is not properly before the Court.

S.E.2d 263 266, and physician and patient, *Watts v. Cumberland County Hospital System Inc.*, 317 N.C. 110, 116, 343 S.E.2d 879, 884 (1986). However,

> [t]he relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. . . . . Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.

*Abbitt*, 201 N.C. at 598, 160 S.E. at 906-07 (internal quotation marks omitted); *see also Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (concluding that fiduciary relationships are characterized by "a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party").

If a fiduciary relationship is found to exist, the fiduciary is "held to a standard 'stricter than the morals of the market place' . . . '[n]ot honesty alone, but the punctilio of an honor the most sensitive, is [then] the standard of behavior.' " *Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (second alteration in original) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)). Liability for breach of fiduciary duty "is based on [the taking advantage of] a confidential relationship rather than a specific misrepresentation." *Barger v. McCoy Hillard Parks*, 346 N.C. 650, 666, 488

S.E.2d 215, 224 (1997) (quoting *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678-79 (1981)); *Priddy v. Kernersville Lumber Co.*, 258 N.C., 653, 658, 129 S.E.2d 256, 261 (1963) (stating that liability for breach of fiduciary duty "may exist without any fraudulent intent"). As a result, "[w]here a relation of trust and confidence exists between the parties, there is a duty to disclose all material facts and failure to do so constitutes" a breach of fiduciary duty. *Vail*, 233 N.C. at 114, 63 S.E.2d at 206 (internal quotation marks omitted).[3] However, before liability for breach of fiduciary duty can exist, it must be shown that the defendant sought to benefit himself at the expense of the other party. *Barger*, 346 N.C. at 666-67, 488 S.E.2d at 224.

The record evidence, as reflected in the factual findings contained in the May 2013 and November 2015 orders, demonstrates that Mr. King was referred to Dr. Bryant by his family practitioner for the purpose of having a hernia repair procedure performed. Individuals consult with surgeons, like they do with other physicians, because such persons possess "special knowledge and skill in diagnosing and treating diseases and injuries, which the patient lacks;" accordingly, "the patient has sought

---

[3] The elements of a claim for breach of fiduciary relationship are the same as those for constructive fraud. *See Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971) (stating that, "[w]here a transferee of property stands in a confidential or fiduciary relationship to the transferor, it is the duty of the transferee to exercise the utmost good faith in the transaction and to disclose to the transferor all material facts relating thereto and his failure to do so constitutes fraud" (citing *Vail,* 233 N.C. 109, 63 S.E.2d 202)); *Rhodes v. Jones*, 232 N.C. 547, 548, 61 S.E.2d 725, 726 (1950) (stating that "[c]onstructive fraud often exists where the parties to a transaction have a special confidential or fiduciary relation which affords the power and means to one to take undue advantage of, or exercise undue influence over the other." (internal quotation marks omitted) (citing *McNeill v. McNeill*, 223 N.C. 178, 25 S.E.2d 615 (1943)).

and obtained the services of the physician because of such special knowledge and skill." *Black v. Littlejohn*, 312 N.C. 626, 646, 325 S.E.2d 469, 482 (1985) (internal quotation marks omitted). Upon arrival at defendants' office, Mr. King was presented with a collection of documents, including the arbitration agreement, and asked to complete them. The majority of the documents that Mr. King was requested to complete and sign involved the provision of medical information, which is inherently sensitive and confidential in nature, for Dr. Bryant's use in determining whether to accept Mr. King as a patient and in determining how he should be treated. No one directed Mr. King's attention to the arbitration agreement, which was only one of a number of documents presented to him on that occasion, or made any attempt to explain the ramifications that would result from any decision on his part to sign it. After Mr. King completed and signed these documents and met with Dr. Bryant, Dr. Bryant agreed to assume responsibility for providing Mr. King with medical care and treatment.

A careful examination of the information contained in the findings of fact made in the May 2013 and November 2015 orders persuades us that, regardless of whether a physician-patient relationship existed between Mr. King and Dr. Bryant at the time that the arbitration agreement was signed, there was a confidential relationship between them at that point. It is difficult for us to see how one could reach any conclusion other than that Mr. King reposed trust and confidence in Dr. Bryant, to whom he had been referred by his family physician for the purpose of receiving

surgical treatment. As we have already noted, the fact that Mr. King decided to consult Dr. Bryant constituted recognition on Mr. King's part that Dr. Bryant possessed "special knowledge and skill in diagnosing and treating diseases and injuries, which the patient lacks." *Black*. 312 N.C. at 646, 325 S.E.2d at 482. Before he even saw Dr. Bryant, Mr. King demonstrated sufficient trust and confidence in him to provide Dr. Bryant with confidential medical information. Finally, unlike Dr. Bryant, Mr. King had received a limited education and had little to no experience interpreting legal documents. As a result, we conclude that a fiduciary relationship existed between Mr. King and Dr. Bryant at the time that Mr. King signed the arbitration agreement.

Similarly, we conclude that defendants violated their fiduciary duty to Mr. King by failing to make full disclosure of the nature and import of the arbitration agreement to him at or before the time that it was presented for his signature. Instead of specifically bringing this agreement, which substantially affected his legal rights in the event that an untoward event occurred during the course of the treatment that he received from defendants, to Mr. King's attention and explaining it to him, defendants presented Mr. King with the arbitration agreement, which, at a minimum, could have been worded more clearly, in a collection of documents, thereby creating the understandable impression that the arbitration agreement was simply another routine document that Mr. King needed to sign in order to become a patient. Moreover, consistent with the unchallenged findings of fact, defendants benefitted

from Mr. King's action in signing the arbitration agreement by ensuring that any subsequent dispute between the parties would be resolved using the forum, procedures, and decision makers of their choice. As a result, the findings of fact contained in the May 2013 and November 2015 orders establish that defendants failed to act consistently with their fiduciary duty to Mr. King by requesting that he sign a document with substantial legal ramifications and which they believed to be of benefit to themselves without making full disclosure to Mr. King.

Aside from the fact that defendants have failed to clearly advance a federal preemption argument in reliance upon *Concepcion* and related decisions in the briefs that they filed before this Court, *State v. Garcell*, 363 N.C. 10, 41, 678 S.E.2d 618, 638 (stating that, "[d]espite citing due process concerns to the trial court, defendant fails to adequately develop a constitutional claim on appeal and has thus abandoned any such argument") (citing N.C. R. App. P. 28(a), (b)(6))), *cert. denied*, 558 U.S. 999, 130 S. Ct. 510, 175 L. Ed. 2d 362 (2009), and the fact that defendants have made no attempt to show that the present arbitration agreement is subject to the Federal Arbitration Act,[4] we do not believe that our decision in this case is in any way

---

[4] Any federal preemption claim advanced in this case pursuant to *Concepcion* and related decisions must rest upon 9 U.S.C. § 2, which applies to "contract[s] evidencing a transaction involving commerce." The necessary nexus between the relevant transaction and "interstate commerce" exists in the event that "the 'transaction' in fact 'involv[e][s]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Allied—Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281, 115 S. Ct. 834, 843, 130 L. Ed. 2d 753, 769 (1995) (first set of brackets in original). Given that the present record contains no indication that the agreement between the parties constitutes a "transaction involving commerce," 9 U.S.C. § 2 (2012), and given that the burden of demonstrating the applicability

inconsistent with the federal preemption principles enunciated in *Concepcion* and related cases. As those decisions clearly recognize, arbitration agreements are subject to invalidation based upon " 'generally applicable contract defenses, such as fraud,[5] duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."[6] *Concepcion*, 563 U.S. at 339, 131 S. Ct. at 1746, 179 L. Ed. 2d at 751 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902, 909 (1996)) (other citations omitted). A decision to refrain from enforcing the agreement on breach of fiduciary duty grounds does not rest upon the fact that it provides for the arbitration of medical negligence claims, does not treat arbitration agreements differently than other contracts, and does not make the enforcement of arbitration agreements more difficult than the enforcement of any other contract. On the contrary, we would have reached the same result on these

---

of the Federal Arbitration Act rests upon defendants, *Sillins v. Ness*, 164 N.C. App. 755, 760, 596 S.E.2d 874, 877-78 (2004) (observing that "defendants were required to submit sufficient evidence in support of their motion to compel arbitration to establish that plaintiff's contract evidenced a transaction involving interstate commerce" and reversing and remanding for additional findings an order denying arbitration, while noting that "defendants offered no evidence in support of their motion to compel arbitration apart from the employment agreement" itself), a necessary precondition to federal preemption under *Concepcion* and related cases simply does not appear to exist in this case.

[5] According to well-established North Carolina law, a breach of fiduciary duty "constitutes fraud." *Link*, 278 N.C. at 192, 179 S.E.2d at 704.

[6] As the language quoted in the text of this opinion clearly recognizes, a party is entitled to challenge the enforceability of an arbitration agreement on recognized state law grounds in addition to unconscionability.

facts with respect to any agreement that substantially affected Mr. King's substantive legal rights, such as an agreement absolving defendants from the necessity for compliance with otherwise applicable confidentiality requirements, providing for the transfer of items of real or personal property from Mr. King to defendants, or waiving any tort or contract-based claims that Mr. King might have had against either or both defendants. Thus, since the breach of fiduciary duty defense to enforcement of the agreement that we uphold in this case does not apply "only to arbitration" or "derive [its] meaning from the fact that an agreement to arbitrate is at issue," *id.* at 339, 131 S. Ct. at 1746, 179 L. Ed. 2d at 759, a refusal to enforce an arbitration agreement on that basis does not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 352, 131 S. Ct. at 1753, 179 L. Ed. 2d at 759 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 2d 581, 587 (1941)). Instead, consistently with *Prima Paint Corp. v. Flood & Conklin Manufacturing. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270, 1277 (1967), our decision simply recognizes that a "claim [of] fraud in the inducement of the arbitration [agreement] itself—an issue which goes to the 'making' of the agreement to arbitrate—[is one that a] court may proceed to adjudicate."[7] As a result, our decision to refrain from enforcing the

---

[7] Given that judicial consideration of fraud-based challenges to the enforceability of arbitration agreements is limited, by virtue of *Prima Paint*, to instances in which the arbitration agreement, rather than the entire contract between the parties, was induced by fraud, the fact that the "benefit" that defendants derived from the existence of the arbitration agreement in this case was the right to litigate any dispute between the parties in an arbitral

arbitration agreement at issue in this case is not precluded by the doctrine of federal preemption.

Thus, for all of these reasons, we hold that the arbitration agreement at issue in this case was obtained as a result of defendants' breach of a fiduciary duty that they owed to Mr. King.[8] In light of that determination, we hold that the Court of Appeals did not err by upholding the trial court's decision to deny defendants' motion to enforce the arbitration agreement.[9] We do, however, wish to make clear that nothing in our decision in this case should be understood to cast any doubt upon the ability of physicians and patients, assuming that proper disclosure is made, to enter into appropriately drafted agreements providing for the arbitration of disputes like the one that underlies this case. However, given our determination that Mr. King

---

rather than a judicial forum has no bearing on a proper analysis of any federal preemption issue that might be before us in this case. Any other result, given the limitations that *Prima Paint* places upon judicial challenges to the enforceability of arbitration agreements predicated on fraud or some similar defense, would effectively eliminate the ability of a party to assert such a defense despite *Concepcion's* recognition of its continued viability.

[8] In view of our determination that the arbitration agreement is unenforceable on breach of fiduciary duty grounds, we need not address plaintiff's unconscionability claim, *Vail*, 233 N.C. at 114, 63 S.E.2d 206 (stating that, in the event of a breach of fiduciary duty, " 'the transaction will be set aside even though it could not have been impeached had no such relation existed, whether the unconscionable advantage was obtained by misrepresentation, concealment or suppression of material facts, artifice, or undue' advantage" (quoting 23 Am. Jur. *Fraud and Deceit* § 14 (1939))), even if there is no finding of unconscionability.

[9] The decision of the Court of Appeals in *Westmoreland v. High Point Healthcare, Inc.*, 218 N.C. App. 76, 721 S.E.2d 712 (2012), has no bearing upon the proper resolution of this case given the absence of a claim that the contract at issue in that case was allegedly procured as the result of a breach of fiduciary duty.

had entered into a fiduciary relationship with Dr. Bryant at the time that the arbitration agreement was signed and the fact that defendants did not make full disclosure to Mr. King before presenting the agreement at issue in this case for his signature, we hold that the arbitration agreement was obtained as the result of a breach of fiduciary duty from which defendants benefitted and is, for that reason, unenforceable. Thus, we modify and affirm the decision of the Court of Appeals in *King II* by holding the arbitration agreement unenforceable on breach of fiduciary duty, as opposed to unconscionability, grounds.

MODIFIED AND AFFIRMED.

Justice MORGAN did not participate in the consideration or decision of this case.

Chief Justice MARTIN dissenting.

In *Tillman v. Commercial Credit Loans, Inc.*, this Court applied common law unconscionability doctrine to invalidate an arbitration clause in the plaintiffs' loan agreements. 362 N.C. 93, 103-09, 655 S.E.2d 362, 370-74 (2008) (plurality opinion); *id.* at 110-11, 655 S.E.2d at 374-75 (Edmunds, J., concurring in result only). Three years later, the Supreme Court of the United States decided *AT&T Mobility LLC v. Concepcion*, which clarified the scope of the Federal Arbitration Act's preemptive effect when state law might otherwise make an arbitration agreement unenforceable.

*See* 563 U.S. 333, 340, 352 (2011). Because *Concepcion*'s rationale extends to a case like this one, in which a broadly applicable state law defense (constructive fraud) purportedly requires non-enforcement of an arbitration agreement specifically because it is an arbitration agreement, I respectfully dissent.

Before I turn to the preemption issue, a few observations are in order about the majority's parsing of state law fiduciary duty principles. Because it asserts that Dr. Bryant committed constructive fraud by failing to adequately disclose certain contractual terms to Mr. King, the majority first has to find that a fiduciary relationship between Mr. King and Dr. Bryant existed when Mr. King filled out the paperwork that included the arbitration agreement—paperwork that Mr. King filled out at Dr. Bryant's office before Dr. Bryant had met him or accepted him as a patient. As the majority correctly notes, certain relationships automatically "give[ ] rise to a fiduciary relationship as a matter of law." *CommScope Credit Union v. Butler & Burke, LLP*, ___ N.C. ___, ___, 790 S.E.2d 657, 660 (2016). Curiously, though, the majority does not decide whether a *physician-patient* relationship had been formed by the time Mr. King signed the arbitration agreement. The majority thus does not determine whether, as a matter of law, a fiduciary duty existed at that time. Instead, the majority decides only that, at the time that Mr. King signed the arbitration agreement, Dr. Bryant owed Mr. King a fiduciary duty in fact.

But, although the majority finds that a fiduciary relationship existed here only as a matter of fact, it effectively determines that a physician-patient relationship

existed here in all but name. A fiduciary relationship exists as a matter of fact "whenever 'there is confidence reposed on one side, and resulting domination and influence on the other.' " *Id.* at ___, 790 S.E.2d at 661 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). Pointing to specific findings of fact by the trial court, the majority maintains that a fiduciary relationship existed between Mr. King and Dr. Bryant primarily because Mr. King placed his trust in Dr. Bryant *as a doctor*.[10] In addition, the majority quotes *Black v. Littlejohn* to suggest that Mr. King sought Dr. Bryant's services because of Dr. Bryant's "special knowledge and skill," *Black v. Littlejohn*, 312 N.C. 626, 646, 325 S.E.2d 469, 482 (1985) (quoting 61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers* § 167 (1981)), and later quotes *Black* to assert that Dr. Bryant possessed "special knowledge and skill in diagnosing and treating diseases and injuries, which the patient lacks," *id.* (quoting 61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers* § 167 (1981)). Both of these quotes come from a passage in *Black* that discusses the characteristics of a fiduciary relationship that exists between a physician and his patient. *See id.* Thus, the majority determines, in effect, that the fiduciary relationship existed *because* Dr. Bryant was Mr. King's *doctor*—even though the majority claims that its conclusion is reached

---

[10] On the other hand, the majority also finds a fiduciary duty here at least in part because Mr. King "provide[d] Dr. Bryant with confidential medical information," which is not exactly based on Dr. Bryant's status as a doctor. (A patient may, for instance, provide confidential medical information to a health insurance company.) But the majority's reasoning confuses a duty of confidentiality—a more limited duty that can arise even when no fiduciary duty exists—with a full-fledged fiduciary duty.

"independent of the existence of a physician-patient relationship."

So the majority tries to have its cake and eat it too. It purports not to take a position on whether a physician-patient relationship exists, but then rests its analysis on the characteristics of the physician-patient relationship. More particularly, the majority does not indicate whether a physician-patient relationship exists at the moment that a prospective patient fills out his preliminary paperwork, even when (as here) the doctor has never met the patient or accepted him as a patient. Yet the majority uses the characteristics of a physician-patient relationship, and the things that a prospective patient thinks and does, to find a fiduciary relationship in fact. By relying almost exclusively on aspects of a physician-patient relationship but then finding a fiduciary duty that is "independent" of that kind of relationship, the majority has muddied the waters in this area of the law. This legal sleight of hand is especially troubling for our fiduciary duty jurisprudence and for doctors and patients, who necessarily rely on us to provide clear and predictable rules to guide their daily interactions.

What's more, the majority's muddled parsing of state law, however well-intentioned, must yield to principles of federal preemption. Section 2 of the Federal Arbitration Act (FAA) provides that an arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for

the revocation of any contract." 9 U.S.C. § 2 (2012).[11] In cases that it handed down before this Court decided *Tillman*, the Supreme Court of the United States held that Section 2 of the FAA preempted state law provisions that "set[ ] out a precise, arbitration-specific limitation." *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 688 n.3 (1996). In *Perry v. Thomas*, for example, the Supreme Court held that Section 2 of the FAA preempted a California statute that allowed actions for the collection of wages to be maintained even in the face of a private arbitration agreement. *See* 482 U.S. 483, 484, 490-91 (1987). And in *Doctor's Associates, Inc. v. Casarotto*, the Court held that Section 2 preempted a Montana statute that imposed special notice requirements "specifically and solely" on "contracts 'subject to arbitration.'" 517 U.S.

---

[11] The majority expresses considerable doubt that Section 2 of the FAA applies to the arbitration agreement at issue in this case. But it is unclear why the majority thinks that this is such an uphill battle. By its terms, Section 2 applies to any contract to arbitrate a transaction that is either specified in the contract or referred to by the contract, as long as the contract "evidenc[es] a transaction involving commerce." 9 U.S.C. § 2. Section 2's phrase "involving commerce" has the same meaning as the phrase "affecting commerce," *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995), and Section 2's reach thus "extend[s] . . . to the limits of Congress' Commerce Clause power," *id.* at 268. The arbitration agreement that Mr. King signed pertained to "any dispute arising out of or related to the provision of healthcare services," and clearly falls within both the commerce power and, by extension, the terms of Section 2. The provision of healthcare services is a form of commerce, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, ___ U.S. ___, ___, 132 S. Ct. 2566, 2587-88 (2012) (opinion of Roberts, C.J.); *id.* at ___, ___, 132 S. Ct. at 2617, 2621 (Ginsburg, J., concurring in part and dissenting in part), and contracting for those services is an economic activity that, when aggregated with other economic activities of its kind, is bound to substantially affect interstate commerce, *see Gonzales v. Raich*, 545 U.S. 1, 22 (2005); *see also Nat'l Fed'n of Indep. Bus.*, ___ U.S. at ___ n.7, 132 S. Ct. at 2622 n.7. The only quirk in this case is that the arbitration agreement was made separately from any agreement to provide the services themselves. But Section 2, which applies to "a contract . . . to settle by arbitration a controversy thereafter arising out of such contract *or transaction*," 9 U.S.C. § 2 (emphasis added), clearly covers this scenario.

at 683 (quoting Mont. Code Ann. § 27-5-114(4) (1995)); *id.* at 688.  Both of these cases addressed state statutory provisions that applied specifically to arbitration agreements, but did not apply to contracts that did not have arbitration agreements.

After *Tillman*, however, the Supreme Court of the United States issued its decision in *AT&T Mobility v. Concepcion*.  In *Concepcion*, the Court squarely held that the use of even a doctrine like unconscionability—which can be applied to any contract, even one that does not contain an arbitration clause—can be preempted by Section 2 of the FAA when the doctrine "ha[s] been applied in a fashion that disfavors arbitration."  563 U.S. at 341.  The Court reaffirmed its holding in *Concepcion* two years later.  *See Am. Express Co. v. Italian Colors Rest.*, ___ U.S. ___, ___, 133 S. Ct. 2304, 2312 (2013).  *Concepcion*'s holding and rationale apply directly to the majority's approach and make the majority's holding untenable.[12]

The majority claims that, because Dr. Bryant owed a fiduciary duty to Mr.

---

[12] The majority asserts that "defendants have failed to clearly advance a federal preemption argument" but then proceeds to address that argument at length.  That is likely because defendants did cite to *Concepcion*.  Quoting *Torrence v. Nationwide Budget Finance*, a recent case from our Court of Appeals, defendants raised the fact that *Concepcion* "dismiss[ed] . . . the idea that an arbitration agreement, apart from any other form of contract, could be found substantively unconscionable based solely upon its adhesive nature."  232 N.C. App. 306, 322, 753 S.E.2d 802, 812, *disc. rev. denied and cert. denied*, 367 N.C. 505, 759 S.E.2d 88 (2014).  Although defendants' reference to this sentence is not the clearest articulation of *Concepcion*'s preemption principle, it is notable that the very next sentence in *Torrence* states that the dismissal of this unconscionability argument "was an explicit part of the Supreme Court's reasoning" in holding that the FAA preempted a state unconscionability rule.  *Id.* at 322, 753 S.E.2d at 812.

King, Dr. Bryant committed constructive fraud "by failing to make full disclosure of the nature and import of the arbitration agreement to" Mr. King. But this conclusion requires the majority to find that defendant sought to benefit himself at Mr. King's expense. *See Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666-67, 488 S.E.2d 215, 224 (1997). The majority does so by finding that the arbitration agreement "ensur[ed] that any subsequent dispute between the parties would be resolved using the forum, procedures, and decision[-] makers of their choice."[13] Of course, that is precisely what arbitration clauses in contracts of adhesion do. And that gets to the heart of the matter: the majority takes issue with the arbitration agreement in this case *because it is an arbitration agreement*.

In doing so, the majority runs headlong into the FAA's prohibition of state law defenses that specifically target arbitration agreements. State law cannot address the concerns presented by contracts of adhesion in a way that "conflict[s] with the FAA or frustrate[s] its purpose to ensure that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 347 n.6. Nor can state courts apply a doctrine like constructive fraud "in a fashion that disfavors arbitration." *Id.* at 341. Because the majority does exactly that, its holding is

---

[13] The majority refers to the trial court's "unchallenged findings of fact" that Dr. Bryant benefitted from the arbitration agreement in this way. But the majority is making a *legal* argument that the arbitration agreement benefitted Dr. Bryant, and that Dr. Bryant may therefore be liable for the breach of his purported fiduciary duty to Mr. King. We review all conclusions of law de novo, even those that the trial court has characterized as findings of fact.

preempted by Section 2 of the FAA.

The majority maintains that its rationale does not single out arbitration agreements for negative treatment because the majority would treat "any agreement that substantially affected Mr. King's substantive legal rights" in the same way. The majority gives examples of other agreements that it thinks would substantially affect a person's legal rights in ways that have nothing to do with arbitration. But the fact that the majority might find *other* contractual provisions to be problematic for other reasons does not change the fact that the majority finds *this* arbitration agreement to be problematic because it is an arbitration agreement.[14]

In sum, if a state court cannot say that an arbitration agreement is unconscionable for arbitration-specific reasons, it likewise cannot say that the same agreement gives rise to a constructive fraud claim for arbitration-specific reasons. By declining to reach the unconscionability issue and focusing on constructive fraud instead, the majority artfully tries to evade federal preemption. But in our post-*Concepcion* legal landscape, federal law cannot be so easily evaded. Because the

---

[14] The majority quotes *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*'s statement that, "if [a] claim is fraud in the inducement of the arbitration clause itself," then a "court may proceed to adjudicate it." 388 U.S. 395, 403-04 (1967). But this invocation of *Prima Paint* is a red herring because *Prima Paint* is not about preemption at all. It is simply about whether a certain kind of claim arising under Section 2 of the FAA—namely, a "claim[ ] of fraud in the inducement of [a] contract generally," *id.* at 404—should be resolved by an arbitrator or by a court, *id.* at 396-97. Thus, *Prima Paint*'s holding that an arbitrator, not a court, should resolve this claim, *see id.* at 404—and its related assertion that a court *may* resolve a claim about fraud in the inducement of an arbitration clause specifically, *see id.* at 403-04—does not provide any grist for the majority's mill.

majority has applied the constructive fraud doctrine in a way that disfavors arbitration, and because the FAA clearly prohibits applying that doctrine in that way, I respectfully dissent.

Justice NEWBY dissenting.

The United States Supreme Court has repeatedly held that arbitration agreements may not be invalidated by state-law defenses arising from the fact that an arbitration agreement is at issue. Congress has explicitly indicated that arbitration is to be favored. Despite these mandates, the majority invents a new defense to enforcement of an arbitration agreement, not raised by plaintiff below, to mask their disparate treatment of and continued hostility towards arbitration, thereby attempting to circumvent an unconscionability analysis. Startlingly, without argument or findings, the majority baldly asserts that the Federal Arbitration Act (FAA) does not apply. This jiggery-pokery is precisely the type of impermissible "rationalization" admonished by the United States Supreme Court. Such a tortured attempt to obviate the FAA fails. Because the arbitration agreement at issue here is not unconscionable and is otherwise enforceable at law, I respectfully dissent.

The majority seeks to avoid an unconscionability analysis by fabricating a contract defense not raised by plaintiff, namely the breach of a fiduciary duty.[15] Based solely on the fact that the contract in question is an arbitration agreement, which the majority contends "substantially affected [plaintiff's] legal rights," the majority holds that "defendants violated their fiduciary duty to [plaintiff] by failing to make full disclosure of the nature and import of the arbitration agreement to him." In their view, this breach of fiduciary duty would void the arbitration agreement ab initio. The majority asserts that "defendants benefitted by [plaintiff's] action in signing the arbitration agreement," and states that the language "could have been worded more clearly" and was presented "in a collection of documents, thereby creating the [ ] impression that the arbitration agreement was simply another *routine* document." (Emphasis added.)

Since 1925 Congress has established that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for

---

[15] Though plaintiffs are Robert E. King and wife Jo Ann O'Neal, the record reflects Mr. King was the primary actor in the following events, and I refer to him in the singular as "plaintiff."

Plaintiff never raised a "breach of fiduciary duty" defense to enforcement of the agreement. At the trial court, plaintiff opposed defendants' motion to compel arbitration on three grounds: that the arbitration agreement was (1) "not a contract" but an unenforceable "agreement to agree," (2) ineffective as to co-plaintiff's consortium claim for lack of her signature, and (3) unconscionable. The trial court denied defendants' motion on the first ground. Only on interlocutory appeal did the Court of Appeals, not plaintiff, mention "fiduciary relationship" as a *procedural consideration* for plaintiff's burden of proof *under his unconscionability defense* on remand. *King v. Bryant*, 225 N.C. App. 340, 349, 737 S.E.2d 802, 809 (2013).

the revocation of any contract." Federal Arbitration Act (FAA), ch. 213, § 2, 43 Stat. 883, 883 (1925) (codified as amended at 9 U.S.C. § 2 (2012)). The FAA "reverse[d] the longstanding judicial hostility to arbitration agreements . . . and place[s them] upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26, 36 (1991). The preemptive effect of the FAA may "extend even to grounds traditionally thought to exist 'at law or in equity for the revocation of any contract.' " *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341, 131 S. Ct. 1740, 1747, 179 L. Ed. 2d 742, 752 (2011) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 2527 n.9, 96 L. Ed. 2d 426, 437 n.9 (1987) (emphasis omitted)).

Arbitration agreements may "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 339, 131 S. Ct. at 1746, 179 L. Ed. 2d at 751 (quoting *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902, 909 (1996)). A court may not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable." *Perry*, 482 U.S. at 493 n.9, 107 S. Ct. at 2527 n.9, 96 L. Ed. 2d at 437 n.9.

Contract defenses cannot be "applied in a fashion that disfavors arbitration." *Concepcion*, 563 U.S. at 341, 131 S. Ct. at 1747, 179 L. Ed. 2d at 752. Such an

application is not justified by state-law "rationalizations," even when the defense could apply to other contracts. *Id.* at 342, 131 S. Ct. at 1747, 179 L. Ed. 2d at 752 ("In practice, of course, the [defense] would have a disproportionate impact on arbitration agreements; but it would presumably apply to [nonarbitration] contracts . . . as well."); *see also id.* at 342, 131 S. Ct. at 1747, 179 L. Ed. 2d at 753 ("Such [rationalizations] are not fanciful, since the judicial hostility towards arbitration that prompted the FAA had manifested itself in 'a great variety' of 'devices and formulas' declaring arbitration against public policy." (quoting *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 406 (2d Cir. 1959))).

Contrary to well-settled law, the majority impermissibly targets arbitration agreements for disparate treatment, attempting to ignore plaintiff's claim of unconscionability and cloaking their disfavor of arbitration under the guise of newly constructed fiduciary-relationship principles. This sort of manufactured state-law justification is a facade and cannot displace the preemptive effect of the FAA.

The purported breach of a fiduciary duty described by the majority is a procedural consideration in an unconscionability analysis. As such, any concerns arising from the circumstances under which plaintiff signed the arbitration agreement are squarely contemplated by his assertion of unconscionability, yet the majority refuses to address this defense *at all*. *See Rite Color Chem. Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 20, 411 S.E.2d 645, 648 (1992) ("Procedural unconscionability involves 'bargaining naughtiness,'" which encompasses the use of

sharp practices and unequal bargaining power. (citations omitted)). Instead, the majority has taken the extraordinary step of crafting a new legal theory for plaintiff, attempting to bypass the obligation to address his unconscionability defense. Though plaintiff "should not be allowed to change his position with respect to a material matter in the course of litigation," *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 340, 777 S.E.2d 272, 282 (2015) (quoting *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 26, 591 S.E.2d 870, 886 (2004)), and "[i]t is not the role of the appellate court[ ] . . . to create [his] appeal," *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) (per curiam), it seems this Court is more than willing to do so for him when arbitration is involved.

Our case law is clear that a fiduciary relationship raises a procedural hurdle, not a requirement to void the transaction. Only when a complainant alleges and establishes that a fiduciary relationship arose *and* that the offending party benefitted from the transaction to the detriment of the complainant, does the burden shift from the complainant to the offending party to prove that "no fraud was committed, and no undue influence or moral duress exerted." *Wachovia Bank & Tr. Co. v. Johnston*, 269 N.C. 701, 711, 153 S.E.2d 449, 457 (1967) (emphasis omitted) (quoting *McNeill v. McNeill*, 223 N.C. 178, 181, 25 S.E.2d 615, 616-17 (1943)); *see Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 116, 343 S.E.2d 879, 884 (1986). The majority fails to identify any such detriment to plaintiff and instead relies on the unlawful presumption that arbitration itself is harmful. The majority's speculation that

"defendants benefitted from [plaintiff's] action in signing the arbitration agreement by ensuring that any subsequent dispute between the parties would be resolved using the forum, procedures, and decision makers of their choice" falls well short of establishing the requisite benefit and harm. Such a "state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with" the FAA. *Perry*, 482 U.S. at 493 n.9, 107 S. Ct. at 2527 n.9, 96 L. Ed. 2d at 437 n.9.

Assuming without deciding that the alleged breach of fiduciary duty results in procedural unconscionability, the agreement is plainly not substantively unconscionable, and plaintiff's defense therefore fails. The agreement contains none of the "harsh, oppressive, and 'one-sided terms' " that are the hallmarks of substantive unconscionability, *Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 648-49 (citations omitted), and follows the "Health Care Claim Settlement Procedures of the American Arbitration Association," governed by the FAA. Furthermore, this analysis comports with recent comprehensive appellate review of arbitration agreements. *See Westmoreland v. High Point Healthcare Inc.*, 218 N.C. App. 76, 77-78, 721 S.E.2d 712, 715 (2012) (concluding that an arbitration agreement was valid and not unconscionable when signed among a stack of other patient intake forms for a nursing home facility). By skirting such an analysis, *see id.* at 79, 721

S.E.2d at 716, the majority's new breach of fiduciary duty defense seems without limit, deprived of the traditional constraints of the unconscionability doctrine.[16]

Irrespective of whether a fiduciary relationship arose, the majority justifies handling plaintiff's arbitration agreement differently than other "routine [contract] documents" because the agreement "substantially affected [plaintiff's] legal rights." Isolating arbitration agreements in this way plainly subjects them to impermissible scrutiny. *See Concepcion*, 563 U.S. at 342, 131 S. Ct. at 1747, 179 L. Ed. 2d at 752. All contracts affect legal rights; the contract at issue here designates dispute resolution through arbitration. *See Am. Express Co. v. Italian Colors Rest.*, ___ U.S. ___, ___, 133 S. Ct. 2304, 2309, 186 L. Ed. 2d 417, 424 (2013) ("[A]rbitration is a matter of contract" and "courts must 'rigorously enforce' arbitration agreements." (citations omitted) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238, 1242, 84 L. Ed. 2d 158, 165 (1985)); *see also Ussery*, 368 N.C. at 336, 777 S.E.2d at 279 ("One who executes a written instrument is ordinarily charged with knowledge of its contents, . . . and he may not base his action on ignorance of the legal effect of its provisions in the absence of considerations such as fraud or mistake." (citations omitted)); *accord Westmoreland*, 218 N.C. App. at 83, 721 S.E.2d at 718 (citation omitted). Either arbitration agreements are on equal footing with other

---

[16] For example, is there always a breach of fiduciary duty by a professional who does not adequately explain arbitration, and is the required result that the agreement is void ab initio?

"routine" contracts or they are not. The United States Supreme Court has directed that a court cannot construe arbitration "agreement[s] in a manner different from that in which it otherwise construes nonarbitration agreements." *Perry*, 482 U.S. at 493 n.9, 107 S. Ct. at 2527 n.9, 96 L. Ed. 2d at 437 n.9.

In a strained effort to add more window dressing, the majority brazenly claims that the FAA does not apply "[g]iven the record contains no indication that the agreement between the parties constitutes a 'transaction involving commerce,' 9 U.S.C. § 2." Not only have the parties not argued this point, nor has the trial court made any accompanying findings, but the first line of plaintiff's arbitration agreement expressly incorporates the FAA by stating: "In accordance with the terms of the Federal Arbitration Act, 9 USC 1-16 . . . ." *See Johnston County v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 92-93, 414 S.E.2d 30, 33 (1992) (discussing the incorporation of law into contracts); *Pike v. Wachovia Bank & Tr. Co.*, 274 N.C. 1, 16, 161 S.E.2d 453, 465 (1968) ("[L]aws in force at the time of the execution of a contract become a part of the contract."); *see also Perry*, 482 U.S. at 490, 107 S. Ct. at 2526, 96 L. Ed. 2d at 436 (The FAA's ambit is expansive and "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause."). Moreover, such professional service contracts generally "involve commerce" under the broad purview of the FAA.[17]

---

[17] *See, e.g.*, *Morrison v. Colo. Permanente Med. Grp.*, 983 F. Supp. 937, 943-44 (D. Colo. 1997) (finding a patient-physician "medical services agreement" evidenced a "transaction

In sum, plaintiff raised his contract defenses and received the benefit of asserting them.[18] The arbitration agreement is not substantively unconscionable, and plaintiff's defense therefore fails. Apparently unsatisfied with this result, the majority, once again, impermissibly targets arbitration agreements. *E.g.*, *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 114, 655 S.E.2d 362, 377 (2008) (Newby, J., dissenting) ("The majority finds the agreement unconscionable based on provisions that would *only exist in an arbitration agreement*." (emphasis added)); *see also Torrence v. Nationwide Budget Fin.*, 232 N.C. App. 306, 321, 753 S.E.2d 802, 811 (concluding that *Tillman* conflicts with United States Supreme Court precedent), *disc. rev. denied and cert. denied*, 367 N.C. 505, 759 S.E.2d 88 (2014). Such a policy decision is not for this Court to determine. *See Perry*, 482 U.S. at 493 n.9, 107 S. Ct. at 2527 n.9, 96 L. Ed. 2d at 437 n.9 (A court may not construe arbitration agreements differently or "rely on the[ir] uniqueness . . . as a basis" for a contract defense, "for this would enable the court to effect what . . . the state legislature cannot."). Instead of pursuing its relentless assault on the FAA, the majority should follow the principles clearly expressed by the United States Supreme Court. Because the

---

involving commerce"); *Ex parte Lorance*, 669 So. 2d 890, 892 (Ala. 1995) (finding a physician's professional services contract "involve[es] commerce"); *Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507, 515-16 (Miss. 2005) (same for patient's "nursing home admissions agreement"), *overruled in part on other grounds by Covenant Health & Rehab., LP v. Estate of Moulds*, 14 So. 3d 695, 706 (Miss. 2009).

[18] Plaintiff's remaining contract defenses are not before the Court at this time.

majority has concocted a new contract defense in a fashion that disfavors arbitration in contravention of the FAA and binding United States Supreme Court precedent, I respectfully dissent.