Constr. Managers, Inc. v. Amory, 2019 NCBC 31.

STATE OF NORTH CAROLINA

COUNTY OF WAYNE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 1359

CONSTRUCTION MANAGERS,
INC. OF GOLDSBORO;
CONSTRUCTION MANAGERS,
LLC; ACTS CONTRACTING, INC.;
and ACTS INVESTMENTS, LLC,

Plaintiffs,

v.

KEVIN D. AMORY,

Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED
COMPLAINT**

THIS MATTER comes before the Court upon Defendant Kevin D. Amory's

("Amory") Motion to Dismiss Plaintiffs' Amended Complaint. ("Motion", ECF No. 89.)

THE COURT, having thoroughly reviewed the Motion, the briefs filed in

support of and in opposition to the Motion, the oral arguments of counsel, and other

appropriate matters of record, concludes, in its discretion, that the Motion should be

GRANTED, in part, and DENIED, in part.

> *Brooks, Pierce, McLendon, Humphrey & Leonard LLP by Gary S.
> Parsons, Eric M. David, and Shepard D. O'Connell for Plaintiffs
> Construction Managers, Inc. of Goldsboro, Construction Managers, LLC,
> ACTS Contracting, Inc., and ACTS Investments, LLC.*

> *Ellis & Winters, LLP by Jonathan D. Sasser and Michelle Liguori for
> Defendant Kevin D. Amory.*

McGuire, Judge.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

1.  The facts relevant to determination of the Motion are drawn from the Amended Complaint.  ("Amended Complaint", ECF No. 78.)

## A. *Plaintiffs' Business*

2.  Plaintiffs Construction Managers, Inc. of Goldsboro ("CMI"), Construction Managers, LLC ("CM, LLC"), ACTS Contracting, Inc., ("ACTS"), and ACTS Investments, LLC ("ACTS Investments"; collectively CMI, CM, LLC, ACTS, and ACTS Investments are "Plaintiffs") are affiliated North Carolina entities that are managed and operated from Wayne County, North Carolina.  (ECF No. 78, at ¶¶ 1–4, 15, 20–24.)  Plaintiffs have common ownership, are highly integrated, and are controlled and managed by Sammy Sasser ("Sasser"), Robert Crenshaw ("Crenshaw"), and Justin Thorn ("Thorn").  (*Id.* at ¶¶ 6–8, 15, 20–24.)  Amory worked for Plaintiffs CM, LLC and ACTS from April 2015 through June 2018.  (*Id.* at ¶ 5.)

3.  Since 2010, Plaintiffs have been engaged in the business of building, leasing, and managing small and mid-sized medical clinics for the United States Department of Veteran Affairs (the "VA").  (*Id.* at ¶ 15.)  The clinics are called community-based outpatient clinics ("CBOC").  (*Id.*)  The process by which Plaintiffs acquire work projects from the VA is known as the "design-to-build-to-lease process," which Plaintiffs describe as "technical, arcane, and laden with bureaucratic hurdles."  (*Id.* at ¶ 17.)  During this process, the VA first publicly identifies a city or town in which to locate a CBOC.  (*Id.*)  Potential bidders on the project then identify and arrange to acquire property on which to locate the VA clinic.  (*Id.* at ¶ 18.)  The

property acquired must meet VA requirements. According to Plaintiffs, "[t]hese requirements are learned from past experiences, and many of them are unpublished and known only to companies that work in this area with the VA." (*Id.*) Next, after the VA approves a particular piece of property on which to locate a CBOC, the VA issues a request for lease proposal ("RLP") "seeking bids from lessors to have contractors build the clinic on the identified property and then, after the clinic is built, to lease the building to the VA." (*Id.* at ¶ 19.) The winning bidder then designs and builds the CBOC, leases it to the VA, and manages the property. (*Id.*) Plaintiffs have been selected a total of 13 times to design, build, and lease clinics for the VA. (*Id.* at ¶ 15.)

4. Plaintiffs consider themselves experts in the VA design-build-to-lease process and "have organized themselves, in substantial part, to be highly successful in the VA CBOC bidding and leasing process." (*Id.* at ¶ 20.) Plaintiff CM, LLC manages CMI. (*Id.* at ¶ 24.) Plaintiff CMI is the corporate entity that deals with, submits proposals to, and contracts with the VA. (*Id.* at ¶ 21.) Plaintiff ACTS signs construction contracts for Plaintiffs' CBOC projects. (*Id.* at ¶ 22.) Plaintiff ACTS Investments is a part-owner of the entities that hold the leases for various completed CBOCs. (*Id.* at ¶ 23.)

**B. CMI's Trade Secrets**

5. CMI identifies the CMI Process—"a proprietary analytical formula and process for assessing and managing all aspects of the VA's 'design-build-to-lease' program, from land acquisition to design-build to property management"—as its

primary trade secret. (*Id.* at ¶¶ 25–26.) According to Plaintiffs, the CMI Process "is a comprehensive and proprietary set of formulas, financial spreadsheets, design drawings, property criteria, and property management guidelines . . . ." (*Id.* at ¶ 32.) Plaintiffs consider both the CMI process as a whole, and its constituent parts, to be trade secrets. (*Id.* at ¶ 26.)

6. The aspects of the CMI Process that Plaintiffs allege to be trade secrets, include:

a. The specific criteria and methodology by which CMI identifies properties on which to build a VA clinic.

b. Detailed and proprietary financial formulas and spreadsheets that allow CMI to submit a comprehensive bid in response to an RLP that will meet the VA's specific financial criteria while also being profitable for CMI and its affiliated companies.

c. CMI's proprietary method and strategy for preparing bids in response to an RLP. These bids are 400 to 1,000 pages long, with detailed information about the property, the proposed [Patient Aligned Care Team ("PACT")] design and construction (down to the carpets and other finishes), and the financial details of the proposed lease.

d. Detailed and proprietary pricing and other supplier information covering all aspects of the construction and ongoing management of properties housing VA clinics. CMI knows from experience how much a project will cost, how to save the government money, and how to complete the project with high quality, at a profit for Plaintiffs.

e. Information about the specific requirements and preferences for VA projects, developed by CMI after many years of dealing with the VA and its contract officers.

(*Id.* at ¶ 28.)

7. In addition to the components listed above, Plaintiffs allege that their Quickbook files are trade secrets that are part of the CMI Process. Plaintiffs'

Quickbook files contain detailed bank account information, private financial information about Plaintiffs and Plaintiffs' employees, and the various financial data that goes into CMI's pricing and bidding documents. Plaintiffs contend that these Quickbook files "are like the Rosetta Stone to the CMI Process, allowing anyone with access to them to re-create, down to the penny, how Plaintiffs are able to successfully bid for and operate VA CBOCs across the country." (*Id.* at ¶ 29.)

8. Plaintiffs state that the CMI Process is the product of years of work and experience, and that "if stolen, the CMI Process would allow the thief to immediately compete with CMI without any of the investment of time and money that Plaintiffs have committed since 2010 to get to this point." (*Id.* at ¶ 32.)

### C. Plaintiffs' Efforts to Protect the CMI Process

9. Most of Plaintiff's confidential and trade secret information, including the CMI Process, is in electronic form. CMI protects its electronic data by storing it on a password-secured cloud account ("the Box Account"). (*Id.* at ¶ 36.) Access to files in the Box Account is limited to employees with a specific business need to access the files. (*Id.*) Additionally, the Box Account allows company managers to track and log every time any company file was accessed, copied, or moved. (*Id.* at ¶ 41.)

10. With respect to its confidential information kept in paper form, CMI holds any paper files in its office, which is locked at night and which is not generally open to the public. Further, it is a company policy that paper files are not taken out of the office, unless Sasser specifically approves. (*Id.* at ¶ 35.)

11.     CMI also attempts to protect its confidential information when submitting bids to the VA by "insisting that the VA keep the financial information included in the bid confidential to the full extent allowed by law." (*Id.* at ¶ 39.) Based on this policy, "when the VA has been asked to publicly disclose such information, it has redacted the sensitive information from all documents." (*Id.*)

### D. Amory's Employment with Plaintiffs, Downloading of Alleged Trade Secrets, and Resignation

12.     Amory was employed by CM, LLC from April 7, 2015 through approximately April 2017. Then, from April 2017 through June 5, 2018, Amory was employed by ACTS as the Vice President. (*Id.* at ¶ 5.) During his employment, Amory acquired a 25% ownership interest in ACTS and in ACTS Investments and was a manager of ACTS Investments. (*Id.*)

13.     While employed by CM, LLC and ACTS, Amory had substantial accounting and bookkeeping responsibilities and also acted as a project manager for certain of CMI's CBOC projects. (*Id.* at ¶¶ 81, 82.)

14.     Plaintiffs allege that "Sasser, Crenshaw, and Thorn reposed trust in Amory and granted him broad access to Plaintiffs' files because he was a project manager with substantial bookkeeping responsibilities for the companies." (*Id.* at ¶ 37.) Amory, however, was "frequently reminded [ ] of the need to maintain the security of Plaintiffs' electronic data" and was once refused the authority to take a laptop with Plaintiffs' Quickbook files home because Sasser believed allowing an employee to have company data in their home or car without proper security measures created a security risk. (*Id.* at ¶ 38.)

15.    On June 5, 2018, Amory resigned from his employment with ACTS to take a job with BridgePoint Civil, LLC ("BridgePoint"), located in Goldsboro, North Carolina.  (*Id.* at ¶ 12.)  BridgePoint, which describes itself as a "turnkey site development company," is part of an affiliated group of companies which hold an unlimited general contractor's license and claim to be a "construction consulting firm providing owner's representation and sustainability consulting for building projects of all types."  (*Id.* at ¶ 92.)

16.    Following his resignation, Amory was removed as a manager of ACTS Investments.   Amory, however, remains a 25% owner of ACTS and ACTS Investments.   (*Id.* at ¶ 5.)

17.    Before resigning his employment with ACTS, Amory downloaded hundreds of gigabytes of Plaintiffs' alleged confidential and trade secret information. The data downloaded by Amory constituted approximately half of all data stored in the Box Account.  Plaintiffs claim that the documents Amory downloaded included documents relating to CMI's research and investigations for several new CBOC projects, personal and company tax returns and bookkeeping files, and other confidential information relating to every project Amory worked on over the years. (*Id.* at ¶¶ 44–48.)  Plaintiffs believe Amory may have downloaded the information to his iPad, iPhone, personal laptop, desktop, or all the above.

18.    In addition to downloading information from the Box Account, Amory also emailed with Patti King ("King"), a former CMI employee who now works for BridgePoint.  (*Id.* at ¶¶ 50–51.)  Amory's emails to King included "confidential and

proprietary documents" aimed at assisting King with her work for BridgePoint and helping BridgePoint. (*Id.*)

### E. The Fraudulent Overpayment Scheme

19. In June 2016, while Amory was employed by CM, LLC, the VA awarded CMI a lease for a CBOC project in Macon, Georgia. (the "Macon Lease", *Id.* at ¶ 53.) The Macon Lease provided that CMI would construct a shell building and that the VA would negotiate with CMI the costs to upfit the building for use as a CBOC. (*Id.*) The property on which the Macon CBOC was to be constructed, however, was owned by a Georgia limited liability company ("the Georgia LLC").[1] In late 2016, the Georgia LLC and CMI agreed that the Georgia LLC would borrow funds to construct and upfit the Macon CBOC, take over the Macon Lease, pay CMI a fee for the assignment of the Macon Lease and to manage the CBOC construction project, and contract with ACTS on a cost-plus basis to serve as the general contractor for the project ("Development Agreement"). (*Id.* at ¶ 58.)

20. Pursuant to the Development Agreement, the Georgia LLC separately entered into a Construction Contract (the "Construction Contract") with ACTS, which provided that ACTS would construct the Macon CBOC on a "cost-plus" basis. (*Id.* at ¶ 61.) The Construction Contract also provided that ACTS would submit cost-plus based payment applications to the Georgia LLC. (*Id.* at ¶ 62.)

---

[1] Plaintiff alleges that a successor LLC to the Georgia LLC was formed sometime after CMI was awarded the Macon Lease (*id.* at ¶ 57), but for ease of reference the Court will continue to refer to the LLC as the "Georgia LLC."

21.     The Georgia LLC subsequently obtained a loan ("Construction Loan") from a Georgia bank (the "Bank") to finance the construction of the CBOC. Amory, as Vice President of ACTS, was responsible for preparing and submitting to the Georgia LLC the cost-plus payment applications pursuant to the Construction Contract. Upon receipt of the payment applications prepared by Amory, the Georgia LLC would submit them to the Bank to obtain draws from their construction loan. (*Id.* at ¶¶ 63–64.)

22.     Plaintiffs allege that "sometime in mid-2017, Amory and the principals of the Georgia LLC devised a scheme to overdraw on the Construction Loan and, in so doing, defraud CMI and ACTS for the personal benefit of Amory and his co-conspirators." (*Id.* at ¶ 65.) To accomplish this, "Amory—without the knowledge or consent of Sasser or any other officer or director of CMI or ACTS—conspired with the principals of [the Georgia LLC] to create, and Amory did create, a falsified set of ACTS payment applications on a percentage-completion basis, rather than a cost-plus basis." (*Id.* at ¶ 66.) The falsified payment applications stated that the amounts due to ACTS were substantially greater than the amounts actually due to ACTS under the cost-plus based Construction Contract. (*Id.* at ¶ 67.)

23.     According to Plaintiffs, "Amory provided the falsified percentage completion-based payment applications to the [Georgia LLC] with the knowledge and intent that [the Georgia LLC] would submit the . . . payment applications to the Bank." (*Id.* at ¶ 68.) Additionally, "because [Amory and the principals of the Georgia LLC] knew that the Bank would require documentation that the full amount of the

draw would be paid to ACTS, [they] conspired for Amory to misrepresent to Sasser that the overpayments were 'mistakes,' and to have Sasser authorize ACTS to wire back to counsel for [the Georgia LLC] the excess amounts paid to ACTS." (*Id*. at ¶ 70.)

24.     Pursuant to this conspiracy, on at least four occasions in the fall of 2017, Amory misrepresented to Sasser that the Bank's overpayments were mistakes. (*Id*. at ¶ 71.) Based on the misrepresentations to Sasser, on at least three occasions, ACTS wired back to counsel for the Georgia LLC the amounts that the Bank had "mistakenly" paid in excess. (*Id*. at ¶ 72.)

25.     In November of 2017, Sasser discovered the fraudulent overpayment scheme following Amory's fourth request that ACTS wire "mistaken" excess payments from the Bank back to counsel for the Georgia LLC. (*Id*. at ¶ 74.) Sasser immediately ordered Amory to stop creating and submitting to the Bank the falsified payment applications.

26.     Plaintiffs allege that because of the fraudulent overpayment scheme, CMI and ACTS were required to "expend time and resources to engage construction estimate, accounting, and legal professionals to investigate and document the circumstances of the falsified payment applications . . . and to negotiate agreements for the winding up of the Macon CBOC project and all associated agreements." Further, Plaintiffs claim that Amory's wrongful conduct and involvement in the scheme "placed in jeopardy ACTS' and CMI's reputation and goodwill with some of its key business partners and the VA." (*Id*. at ¶ 77.)

### F. Amory's Alleged Fiduciary Duties and Breach of Fiduciary Duties

27.    Plaintiffs allege that as a corporate officer (Vice President) of ACTS and a manager of ACTS Investments, Amory owed fiduciary duties to those entities as a matter of law. (*Id.* at ¶ 78.) Plaintiffs allege Amory breached those duties by:

> (a) [ ] acquiring confidential business information, that consists of information and data owned by ACTS and ACTS Investments, including the entirety of their accounting and bookkeeping files, and then taking that information to his new employer within the construction industry[.]
>
> (b) [ ] conspiring to carry out, and carrying out, a fraudulent overpayment scheme[.]
>
> (c) [ ] wait[ing] until just after ACTS made a $150,000 distribution to him to announce his departure.
>
> (d) [ ] g[iving] an unwarranted raise and bonus to former ACTS employee, Patti King, an employee [Amory] had convinced Plaintiffs to hire. During her employment, Plaintiffs found that Ms. King did not possess the skillsets Amory claimed that she had in QuickBooks and other necessary software. Ms. King now works for BridgePoint.

(*Id.*)

28.    Plaintiffs also maintain that Amory owed fiduciary duties to CMI and CM, LLC on account of the special trust and confidence they reposed in him to act as a bookkeeper and accountant on behalf of CMI and its affiliated companies. (*Id.* at ¶¶ 80–81.) Furthermore, Plaintiffs allege Amory owed a fiduciary duty to CMI on account of the trust and confidence CMI placed in him as a project manager and because of the way he operated as a project manager. (*Id.* at ¶¶ 82–84.)

29.     Plaintiffs claim Amory breached his fiduciary duties to CMI and CM, LLC by "acquiring confidential and trade secret information owned by CMI, which consists of the CMI Process and all CMI's and CM LLC's accounting and bookkeeping files, and then taking that information to his new employer within the construction industry." (*Id.* at ¶ 85.)  Further, Plaintiffs allege Amory breached his duty to CMI by "conspiring to carry out, and carrying out, [the] fraudulent overpayment scheme." (*Id.* at ¶ 86.)

### G. Procedural History

30.     On July 6, 2018, Plaintiffs initiated this case by filing a Complaint and a Motion for Temporary Restraining Order and Preliminary Injunction in the Superior Court of Wayne County.  ("Complaint", ECF No. 3; "Motion for TRO/PI", ECF No. 6.)  On that same date, a Temporary Restraining Order ("TRO") was entered by the Honorable William Bland.  (ECF No. 8.)

31.     On July 11, 2018, the lawsuit was designated to this Court and assigned to the undersigned.  ("Designation Order", ECF No. 1; "Assignment Order", ECF No. 2.)  On that same date, the Court entered an order extending the TRO until the Court could hear and rule upon Plaintiffs' Motion for Preliminary Injunction ("Extension Order", ECF No. 11), and on October 11, 2018, the Court granted in part and denied in part Plaintiff's Motion for Preliminary Injunction.  ("Order on Motion for PI", ECF No. 67.)

32.     On November 14, 2018, Plaintiffs filed the Amended Complaint.  In the Amended Complaint, Plaintiffs make the following claims against Amory:

misappropriation of trade secrets (first claim); breach of fiduciary duty (second claim); constructive fraud (third claim); fraud (fourth claim); violation of the North Carolina Unfair or Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1 (hereinafter the North Carolina General Statutes are referred to as "G.S.") (fifth claim); violation of G.S. § 14-458 (sixth claim); and punitive damages (seventh claim).

33. On January 14, 2019, Amory filed the Motion (ECF No. 89) and a supporting brief. (Br. in Supp., ECF No. 90.) On February 6, 2019, Plaintiffs filed a response brief in opposition to the Motion. (Br. in Opp., ECF No. 91.) On February 17, 2019, Defendant filed a reply brief in support of the Motion. (Reply Br., ECF No. 92.) The Motion came before the Court for a hearing on February 27, 2019 and is now ripe for review.

## II. ANALYSIS

### A. *Standard of Review*

34. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for

trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought." *Id.*

35.     "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (*quoting Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

36.     In deciding a motion to dismiss, the Court must construe the Amended Complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).  The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation and quotations omitted).

37.     Applying these standards, the Court will address each of Plaintiffs' claims in turn.

**B. *Misappropriation of Trade Secrets***

38.     In their first claim in the Amended Complaint, Plaintiffs allege that Amory misappropriated "[t]he CMI Process and other trade secret information described in [the Amended Complaint]" in violation of G.S. § 66-152, *et seq*.  (ECF No.

78, at ¶¶ 94–95.) Amory, however, argues that Plaintiffs have failed to plead a claim for misappropriation of trade secrets. Specifically, Amory argues that (1) CMI, as the owner of the purported trade secrets, is the only Plaintiff with a misappropriation of trade secrets claim; (2) Plaintiffs' claim fails because their overly broad allegations do not sufficiently identify the trade secrets at issue; and (3) Plaintiffs' claim fails because they have not made reasonable efforts to guard the secrecy of CMI's trade secrets. (ECF No. 90, at pp. 5–12.)

39. Under the North Carolina Trade Secrets Protection Act ("TSPA"), "[t]he *owner* of a trade secret [has a] remedy by civil action for misappropriation of his trade secret." G.S. § 66-153 (emphasis added). The TSPA defines a trade secret as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66-152(3).

40. The TSPA defines "misappropriation" of a trade secret as the "acquisition, disclosure, or use of a  trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." G.S. § 66-152(1).

41. To state a claim for misappropriation of a trade secret under the TSPA, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609, 811 S.E.2d 542, 547–48 (2018) (citation and quotations omitted). Additionally, the plaintiff must "set forth with sufficient specificity the acts by which the alleged misappropriation occurred." *Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at *9 (N.C. Super. Ct. Oct. 21, 2016).

42. The North Carolina Supreme Court has stated that "there is no presumption that a thing is secret" and has warned plaintiffs of the shortcomings of relying on general allegations. *Krawiec*, 370 N.C. at 611, 811 S.E.2d at 549 (citation and quotations omitted). Likewise, the North Carolina Court of Appeals has provided that "a complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is insufficient to state a claim for misappropriation of trade secrets." *Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 327, 660 S.E.2d 577, 585–86 (2008) (citation and quotations omitted). Rather, in alleging a misappropriation of trade secrets claim, the plaintiff must include specific details about why the alleged trade secret qualifies as such under G.S. § 66-152(3). *Krawiec*, 370 N.C. at 611, 811 S.E.2d at 549 ("[P]laintiffs' failure to describe a specific idea, concept, strategy, or tactic with respect to their marketing plan or to provide any detail about their dance productions renders their claim too general for this Court to

determine—even taking plaintiffs' factual allegations as true—whether there is a 'formula, pattern, program, device, compilation of information, method, technique, or process' at issue that '[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering.'" (quoting G.S. § 66-152(3)); *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at \*25–26 (N.C. Super. Ct. Apr. 23, 2015) ("A plaintiff must also demonstrate that information is of actual or commercial value, is not 'generally known or readily ascertainable,' and is subject to reasonable efforts to maintain its secrecy." (quoting G.S. § 66-152(3)). Simply alleging that the information at issue falls into a category of trade secrets previously recognized by our courts is insufficient. *See Krawiec*, 370 N.C. at 610, 811 S.E.2d at 548 ("*Provided that the information meets the two requirements for a trade secret as defined in subsection 66-152(3)*, we agree with the determination of the Court of Appeals that [i]nformation regarding customer lists, pricing formulas and bidding formulas can qualify as a trade secret under G.S. § 66-152(3)." (citation and quotations omitted) (emphasis added)).

43.     With respect to alleging reasonable efforts to maintain the secrecy of a trade secret, "'only where efforts to maintain the secrecy of the allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the 12(b)(6) stage.'" *AYM Techs., LLC. v. Rodgers*, 2018 NCBC LEXIS 14, at \*40 (N.C. Super. Ct. Feb. 9, 2018) (quoting *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at \*14).

44.     At the outset, the Court first concludes that CMI is the only Plaintiff with a cognizable misappropriation of trade secrets claim with respect to the CMI Process and its component parts, with the exception of each Plaintiff's individually owned QuickBook files. The TSPA grants only "[t]he owner of a trade secret" the remedy of a civil action for misappropriation of a trade secret. G.S. § 66-153. Here, Plaintiffs allege that the CMI Process and its component trade secrets and confidential information "belong[ ] to CMI." (ECF No. 78, at ¶ 26.) Plaintiffs even titled the section of the Amended Complaint discussing the trade secrets at issue "CMI'S TRADE SECRETS—THE CMI PROCESS." (*Id.* at p. 5.) The only trade secret which Plaintiffs claim is owned by an entity other than CMI is the QuickBook files. The Amended Complaint states that "each Plaintiff owns its individual QuickBook files[.]" (*Id.* at ¶ 29.) Therefore, each of Plaintiffs has a cognizable misappropriation of trade secrets claim with respect to their individual Quickbook files, but only CMI has a claim with respect to the other components of the CMI Process.

45.     Next, the Court concludes that the Amended Complaint sets forth "with sufficient specificity the acts by which the alleged misappropriation occurred." *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *9. The allegations clearly allege that Amory downloaded a large quantity of information from Plaintiffs' Box Account to his personal device(s), including many of CMI's alleged trade secrets. (ECF No. 78, at pp. 9–11.)

46. Additionally, Plaintiffs have alleged that they've taken some measures to protect the secrecy of their trade secret information, such as storing their trade secrets in the password protected Box Account, limiting access to trade secret information to employees with a specific business need to access the information, having the ability to track who has accessed or copied trade secret information from the Box Account, and keeping any paper files containing trade secrets secured in their office. This is sufficient, at this stage, to state that Plaintiffs have taken reasonable measures to protect their trade secrets. *Bldg. Ctr.*, 2016 NCBC LEXIS 79, at \*14 ("[O]nly where efforts to maintain secrecy of allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the 12(b)(6) stage.").

47. Lastly, the Court addresses the real crux here, whether Plaintiffs allegations sufficiently identify, in more than conclusory fashion, the aspects of their alleged trade secrets which "[d]erive[ ] independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering[.]" G.S. § 66-152(3).

48. While Plaintiffs' allegations are less than robust, Plaintiffs have identified their trade secrets, and the aspects of their trade secrets that derive value from not being known, sufficiently enough to put Amory on notice of what he is accused of misappropriating and for this Court to determine whether misappropriation has or is threatened to occur. First, Plaintiffs have alleged that their trade secrets include information—such as financial formulas, pricing policies,

methods and strategies, and confidential pricing and supplier information—that our courts have previously recognized can qualify as trade secrets. *See GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 233, 752 S.E.2d 634, 649 (2013) ("This Court has held that cost history records; pricing policies, formulas, and information; and customer lists constitute trade secrets."); *see also Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375, 542 S.E.2d 689, 692 (2001) (agreeing that "[c]onfidential data regarding operating and pricing policies can . . . qualify as trade secrets."); *New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *7, 34–37 (N.C. Super. Ct. Aug. 18, 2017) (concluding Plaintiff stated a claim for misappropriation of its "confidential and proprietary strategies" contained in a document).

49.     Next, Plaintiffs have identified why their trade secrets derive commercial value from not being known. Plaintiffs' overarching allegation is that the CMI Process and its component parts are valuable because they reflect what Plaintiffs have learned, through experience, "works and does not work when it comes to building and operating VA CBOCs." (ECF No. 78, at ¶ 31.) Furthermore, Plaintiffs allege that the information contained in the CMI Process is only obtainable through working on VA CBOC projects and learning the VA's "unpublished" preferences and can't be independently developed or reverse engineered. (*Id.* at ¶¶ 18, 26.) For example, CMI's detailed financial formulas and spreadsheets derive value because they "allow CMI to submit a comprehensive bid in response to an RLP that will meet the VA's specific financial criteria while also being profitable[.]" (*Id.*) In other words,

Plaintiffs imply that CMI has manipulated the formulas and spread sheets to reflect its knowledge of how to submit successful bids to the VA and make a profit. Similarly, Plaintiffs' QuickBook files are valuable because they contain "detailed bank account information, private financial information about Plaintiffs and Plaintiffs' employees, and the various financial data that goes into CMI's pricing and bidding documents." (*Id.* at ¶ 29.) Plaintiffs insist that access to the QuickBook files would allow competitors to re-create "how Plaintiffs are able to successfully bid for and operate VA CBOCs across the country." (*Id.*) Liberally construed, these and other similar allegations of Plaintiffs are sufficient, at this juncture, to allow Plaintiffs' misappropriation of trade secrets claim to survive.

50. In conclusion, Amory's motion to dismiss each Plaintiff's misappropriation of trade secrets claim related to the QuickBook files should be DENIED. Additionally, Amory's motion to dismiss CMI's misappropriation of trade secrets claim, with respect to the CMI Process and its component parts, should be DENIED. To the extent CM, LLC, ACTS or ACTS Investments attempts to state a misappropriation of trade secrets claim based on CMI's trade secrets, however, Amory's motion to dismiss should be GRANTED.

## C. Breach of Fiduciary Duty and Constructive Fraud

51. In their second and third claims for relief, Plaintiffs bring breach of fiduciary duty and constructive fraud claims against Amory. Plaintiffs allege that Amory owed fiduciary duties to each individual Plaintiff and willfully and maliciously breached those duties by (1) misappropriating confidential and trade secret

information; (2) conspiring with the owners of the Georgia LLC to carry out the fraudulent overpayment scheme; (3) waiting until after ACTS made a $150,000 distribution to announce his resignation; and (4) giving an unwarranted bonus and raise to King. (ECF No. 78, at ¶ 103.) Plaintiffs further allege that Amory personally benefitted from the breaches of fiduciary duty, thereby giving rise to a constructive fraud claim. (*Id.* at ¶¶ 106–11.) Amory argues that Plaintiffs failed to state claims for breach of fiduciary duty and constructive fraud because (1) CMI and CM, LLC have not sufficiently alleged that Amory owed them a fiduciary duty; (2) Plaintiffs have not sufficiently alleged that Amory breached a fiduciary duty or caused harm to any of Plaintiffs; and (3) Plaintiffs do not allege that Amory benefitted himself at their expense. (ECF No. 90, at pp. 14–20.)

52.     To state a claim for breach of fiduciary duty, a plaintiff must show the existence of a fiduciary relationship, a breach of that duty, and that the breach proximately caused injury to the plaintiff. *Gao v. Sinova Specialties, Inc.*, 2018 NCBC LEXIS 71, at *36 (N.C. Super. Ct. July 16, 2018) (citing *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006)).

53.     In contrast, to plead a claim for constructive fraud, a plaintiff must allege a breach of a fiduciary duty and allege that the defendant benefitted himself as a result of the breach. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004) ("The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself."); *Crumley & Assocs., P.C. v. Charles*

*Peed & Assocs., P.A.*, 219 N.C. App. 615, 620, 730 S.E.2d 763, 767 (2012) ("To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction."). Additionally, a claim of constructive fraud must be pled with particularity. *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 679 (1981). The particularity requirement is satisfied by "alleging facts and circumstances "(1) which created the relation of trust and confidence, and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Id.* (citation and quotations omitted).

i. Existence of Fiduciary Relationship

54. The Court begins its analysis by assessing whether a fiduciary relationship existed between Amory and Plaintiffs. Amory does not dispute that, as a corporate officer of ACTS and a manager of ACTS Investments, he owed fiduciary duties to ACTS and ACTS Investments as a matter of law. (ECF No. 90, at p. 15.) He does, however, dispute that he owed *de facto* fiduciary duties to CMI and CM, LLC arising from his relationship with those entities. Amory primarily argues that CMI and CM, LLC cannot meet the extraordinary bar of alleging a *de facto* fiduciary duty because he "had no relationship with either CMI or CM, LLC" as he was never employed by CMI and was not an employee of CM, LLC at the time of the alleged breaches. (ECF No. 90, at pp. 15–16.)

55. "Courts in North Carolina recognize that 'a fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*)[.]'" *Alkemal Sing. Private Ltd. v. Dew Global Fin., LLC*, 2018 NCBC LEXIS 36, at *34 (N.C. Super. Ct. April 19, 2018) (quoting *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 635, 794 S.E.2d 346, 351 (2016) (alteration in original)). "The standard for finding a *de facto* fiduciary relationship is a demanding one: [o]nly when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Lockerman*, 250 N.C. App. at 636, 794 S.E.2d at 352 (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (internal quotations omitted)). Put another way, a *de facto* fiduciary relationship exists only where "'there is confidence reposed on one side, and *resulting domination and influence on the other*.'" *Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (2001) (emphasis in original) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)).

56. Here, Plaintiffs first maintain that Amory owed *de facto* fiduciary duties to CMI and CM, LLC because of the special trust and confidence they reposed in him as an accountant/bookkeeper. Plaintiffs allege that "CMI and CM, LLC trusted Amory with substantial responsibility for accounting and bookkeeping on behalf of CMI and all its affiliated companies[,]" including providing Amory with "access to all of Plaintiffs' QuickBook files and tax returns." (*Id.* at ¶¶ 80–81.)

57.     The Court concludes that Plaintiffs' allegations fall well short of alleging that Amory was in a position of domination and influence over CMI or CM, LLC with regard to his role as an accountant and bookkeeper. While his role as bookkeeper undoubtedly provided Amory access to confidential financial information, this alone does not create fiduciary responsibilities to CMI or CM, LLC. *See Hager v. Smithfield E. Health Holdings, LLC*, No. COA18-651, 2019 N.C. App. LEXIS 238, at *17 (2019) ("While it is true that the provision of confidential information places confidence in the recipient, that alone does not create a fiduciary duty[.]"). Plaintiffs do not allege that the owners or managers of CMI or CM, LLC lacked access to the financial and other information needed to manage the companies. Nor do Plaintiffs allege that Sasser and Crenshaw did not have access to the same financial and other information to which Amory was provided access, or that Amory was the only one with access to, or technical knowledge of, CMI's or its affiliated companies' accounting records. In the absence of such allegations, the mere fact that Amory was given substantial accounting and bookkeeping responsibility is not sufficient to establish a fiduciary relationship. *Timbercreek Land & Timber Co., LLC v. Robbins,* 2017 NCBC LEXIS 64, at *20 (N.C. Super. Ct. July 28, 2017) ("Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led to the employer being subjugated to the improper influences or domination of [its] employee" (citation and quotations omitted)).

58.     Plaintiffs also allege that Amory owed a fiduciary duty to CMI because of the trust CMI reposed in him to act as a project manager for eight of its CBOC

projects and "because of the way [he] operated as a project manager[.]" (*Id.* at ¶¶ 82–84.)  Plaintiffs state that, in his role as project manager, Amory "shared extremely limited information with Sasser, Crenshaw, or Thorn about the project[s], and he never shared any information about his work on the project in Macon, Georgia." (*Id.* at ¶ 83.)  Therefore, Amory "had superior knowledge about [the projects he worked on], and CMI and its principals were forced to rely on [him] to a substantial degree." (*Id.* at ¶ 84.)

59.   The allegations also are insufficient to give rise to a fiduciary relationship between Amory and CMI based on Amory's role as a project manager. Plaintiffs state only that Amory shared limited information about the CBOC projects he managed with Sasser and Crenshaw, the officers and directors of CMI.  Plaintiffs, however, do not allege that Amory refused to share information about the projects with Sasser and Crenshaw or somehow dominated or controlled Sasser, Crenshaw, and CMI with respect to managing CBOC projects.  Nor do they allege facts showing that Amory held all the financial power or technical knowledge with regard to managing CBOC projects.  Therefore, the allegations fail to give rise to a fiduciary relationship between CMI and Amory with regard to his role as a project manager. *See Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at *55 (N.C. Super. Ct. Aug. 1, 2016) (stating that the mere fact that an employer delegated responsibility or "placed confidence" in an employee is not enough to create a fiduciary duty, unless the facts show "that the employer [ ] was

somehow subjugated to the improper influences or domination of his employee." (citations and quotations omitted)).

60.    In conclusion, the Plaintiffs have failed to allege the existence of a fiduciary relationship between Amory and CMI or CM, LLC.  Therefore, Amory's motion to dismiss CMI and CM, LLC's breach of fiduciary duty and constructive fraud claims should be GRANTED.

ii.  Breach and Injury

61.    The Court now turns its attention to whether Plaintiffs sufficiently alleged a breach of fiduciary duty by Amory against ACTS and ACTS Investments and whether Plaintiffs allege that the breach proximately caused injury to ACTS or ACTS Investments.  Plaintiffs state that Amory breached his fiduciary duties to ACTS and ACTS Investments by acquiring and taking their trade secrets and confidential information to his new employer.  (ECF No. 78, at ¶ 78.)  Additionally, Plaintiffs state that Amory breached his fiduciary duties to ACTS by carrying out the fraudulent overpayment scheme; waiting until after receiving a $150,000 distribution from ACTS to announce his departure; and giving an unwarranted raise and bonus to former ACTS employee King.  (*Id.* at ¶¶ 78–79.)   Amory argues that Plaintiffs failed to allege a breach of fiduciary duty because (1) only CMI owned the trade secrets at issue; (2) the Amended Complaint fails to explain how Amory's participation in the fraudulent overbilling scheme constituted a breach of his duties to ACTS; (3) Amory remains a 25% owner of ACTS and the Amended Complaint does not allege he was not entitled to the distribution or that he would not have received

it had he announced his resignation earlier; and (4) the Amended Complaint does not allege that Amory knew that King's raise and bonus were unwarranted. (ECF No. 90, at pp. 17–19.) Amory also argues that Plaintiffs have failed to allege that they suffered any cognizable harm. *Id.*

62. The Court first concludes that Plaintiffs have sufficiently stated a breach of fiduciary duty by Amory against ACTS and ACTS Investments arising from his alleged misappropriation of their QuickBook files. Amory owed fiduciary duties to ACTS as an officer, and to ACTS Investments as a Manager. The Amended Complaint states that ACTS and ACTS Investments owned their individual QuickBook files, which they consider trade secrets, and that Amory misappropriated this information and took it to his new employer in the construction industry. (ECF No. 78, at ¶¶ 29, 78.) Further, Plaintiffs allege they have suffered substantial damages as a result of this breach and are entitled to over $25,000 in damages. These allegations are sufficient, at this stage, to allege that Amory breached his fiduciary duties to ACTS and ACTS Investments by wrongfully taking their trade secrets with the intention of using them to compete with Plaintiffs. *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *24–26 (N.C. Super. Ct. Feb. 18, 2016) (concluding that the plaintiff's breach of fiduciary duty claim survived a motion to dismiss where the plaintiff contended that the defendant, a former employee of plaintiff, took "improper steps," including allegedly misappropriating trade secrets, to facilitate competition against the plaintiff).

63.     The Court also concludes that Plaintiffs sufficiently alleged that Amory breached his fiduciary duty to ACTS by engaging in the fraudulent overpayment scheme. Generally, the existence of a fiduciary relationship creates a duty to fully disclose material facts. *Vail v. Vail*, 233 N.C. 109, 116, 63 S.E.2d 202, 207 (1951) ("[A] confidential of fiduciary relation imposes upon the one who is trusted the duty to . . . disclose all material facts affecting the relation."). Here, Plaintiffs allege that Amory intentionally withheld information about the fraudulent concealment scheme from other officers and directors of ACTS in breach of his duty to disclose. This is sufficient to allege that Amory breached his fiduciary duty to ACTS. Furthermore, Plaintiffs allege that they suffered actual damages on account of the fraud because they were "forced to expend time and resources" to investigate the fraudulent scheme and because the scheme placed ACTS and CMI's professional reputation in jeopardy. These allegations of actual damages were sufficient to put Amory on notice of the alleged harm caused by his breach and to state a claim for breach of fiduciary duty with respect to the fraudulent overpayment scheme.

64.     Finally, the Court concludes that Plaintiffs fail to allege that Amory breached his fiduciary duty to ACTS by receiving a $150,000 distribution before departing from the company, or by paying ACTS employee King a bonus and giving her a raise. Amory remains a 25% owner of ACTS and Plaintiffs failed to allege in any way that he was not entitled to receive the distribution at issue from ACTS. Nor have Plaintiffs cited any authority for the proposition that leaving a company after receiving an ownership distribution constitutes a breach of fiduciary duty.

Additionally, Plaintiffs present no more than a bare allegation that the raise and bonus Amory paid to Patti King was "unwarranted." Plaintiffs do not provide supporting allegations that Amory was aware that King was unqualified or undeserving of the raise or bonus. Therefore, Plaintiffs have failed to allege that Amory breached his fiduciary duty to ACTS by accepting his $150,000 distribution before resigning his employment with ACTS, or by paying King a raise and bonus while she was employed by ACTS.

### iii. Personal Benefit

65. Amory next argues that Plaintiffs' claims for breach of fiduciary duty and constructive fraud should be dismissed because (1) Plaintiffs' breach of fiduciary duty claim does not allege that Amory sought to benefit himself; and (2) Plaintiffs' constructive fraud claim fails to allege *with particularity* that Amory sought to benefit himself.

66. Amory relies on the Supreme Court case of *King v. Bryant* for the proposition that a claim for breach of fiduciary duty must allege that the defendant sought personal benefit. 369 N.C. 451, 795 S.E.2d 340 (2017). In *Bryant*, the court wrote that "before liability for breach of fiduciary duty can exist, it must be shown that the defendant sought to benefit himself at the expense of the other party." *Id.* at 465, 795 S.E.2d at 349. The *Bryant* court also stated in a footnote that "[t]he elements of a claim for breach of fiduciary relationship are the same as those for constructive fraud." *Id.* at n.3.

67. The Court notes that the holding in *Bryant* is difficult to reconcile with the many North Carolina appellate court and business court decisions which recognize a distinction between breach of fiduciary duty and constructive fraud claims, most notably that "wrongful benefit is . . . an element of constructive fraud and not of a claim for breach of fiduciary duty." *White*, 166 N.C. App. at 294, 603 S.E.2d at 155–56 (citing *Barger*, 346 N.C. at 666, 488 S.E.2d at 224) (internal quotations omitted)); *e.g., Hauser v. Hauser*, 252 N.C. App. 10, 16, 796 S.E.2d 391, 395 (2017) ("The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." (citation and quotations omitted)); *Trillium Ridge Condo. Ass'n v. Trillium Links & Vill., LLC*, 236 N.C. App. 478, 502, 764 S.E.2d 203, 220 (2014) (same); *Ellison v. Alexander*, 207 N.C. App. 401, 408, 700 S.E.2d 102, 108 (2010) (same); *Can-Dev, ULC v. SSTI Centennial, LLC*, 2018 NCBC LEXIS 9, at *21 (N.C. Super. Ct. Jan. 25, 2018) (same); *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *23–24 (N.C. Super. Ct. Oct. 2, 2017) ("[C]auses of action [for breach of fiduciary duty and constructive fraud] are different and require Plaintiffs to prove different elements.").

68. The requirement that a fiduciary seek to benefit himself appears particularly problematic in the context of claims based on breach of statutory duties by corporate directors and officers for failure to exercise a duty of care transacting the business of the corporation or LLC, which may not involve any benefit to the director. *See, e.g., Seraph Garrison, LLC v. Garrison*, No. COA14-1166, 2016 N.C.

App. LEXIS 1376, at *12–16 (2016) (holding a corporate president's failure to pay payroll taxes owed by corporation to state and federal tax authorities for three years was a breach of fiduciary duties imposed on corporate officers by G.S. § 55-8-42(a)).

69. In any event, the Court need not address in this case the impact of *Bryant* on the elements of a claim for breach of fiduciary duty since the Amended Complaint sufficiently alleges that Amory personally benefitted from his alleged breaches, and states a claim for breach of fiduciary duty, even under the *Bryant* Court's recitation of the claim. Plaintiffs allege that Amory "took advantage of his fiduciary relationship . . . in order to benefit himself financially by . . . using Plaintiffs' trade secrets to compete unfairly against Plaintiffs" and that "Amory personally benefitted from [the fraudulent] overpayment scheme." (ECF No. 78, at ¶¶ 73, 109.) While the claim of personal benefit may not be borne out by the facts revealed in discovery, the allegations are minimally sufficient at this early stage of the case to survive a motion to dismiss.

70. In conclusion, Plaintiffs have sufficiently stated claims against Amory for breach of his fiduciary duties to ACTS and ACTS Investments by misappropriating their alleged trade secrets with the intent to compete and by carrying out the fraudulent overpayment scheme. Amory's motion to dismiss those claims should be DENIED. Amory's motion to dismiss all other breach of fiduciary duty claims brought by Plaintiffs, however, should be GRANTED.

71. The Court also is not persuaded by Amory's argument that the element of personal benefit necessary to a claim for constructive fraud must be

alleged with particularity since Amory does not cite, and the Court is unable to locate, any authority supporting that proposition. (ECF No. 90, at pp. 19–20.) The Court has concluded that Plaintiffs adequately allege that Amory personally benefitted from the breaches of fiduciary duty.

72.     In conclusion, ACTS and ACTS Investments have also sufficiently alleged constructive fraud claims against Amory for his alleged misappropriation of their QuickBook files with intent to compete, and ACTS has sufficiently alleged a constructive fraud claim against Amory for his participation in the fraudulent overpayment scheme. Amory's motion to dismiss those claims should be DENIED. Amory's motion to dismiss Plaintiffs' other constructive fraud claims, however, should be GRANTED.

### D. Actual Fraud

73.     In their fourth claim for relief, CMI and ACTS bring a claim of actual fraud against Amory arising from the fraudulent overpayment scheme.[2] Plaintiffs allege that: (1) Amory made false representations of material fact to Sasser when he stated, on at least four different occasions, that overpayments to the Bank were mistakes; (2) the false representations were reasonably calculated to deceive and made with the intent to deceive Sasser; (3) Sasser was deceived and reasonably relied upon Amory's representations by wiring excess payments back to the owners of the Georgia LLC; and (4) that as a result of the false representations CMI and ACTS

---

[2] Plaintiffs' fraud claim does not state that it was brought solely on behalf of ACTS and CMI, but Plaintiffs allege that ACTS and CMI were the only entities to suffer damages from the scheme. (ECF No. 78, at ¶¶ 76–77, 118.) Thus, the Court will treat the claim as being brought on behalf of ACTS and CMI.

Contracting incurred costs for professional services in excess of $25,000. (ECF No. 78, at pp. 20–21.) Amory argues that the claim must be dismissed because Plaintiffs failed to allege the elements of reliance or injury. (ECF No. 90, at p. 12.)

74. The elements of a claim for actual fraud are: "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Collier v. Bryant*, 216 N.C. App. 419, 430–31, 719 S.E.2d 70, 80 (2011) (citation and quotations omitted). Further, claims for actual fraud must be pled with particularity. *Terry*, 302 N.C. at 84–85, 273 S.E.2d at 678–79. "[I]n pleading actual fraud the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Id.* at 85, 273 S.E.2d at 678. "Dismissal of a claim for failure to plead with particularity is proper where there are no facts whatsoever setting forth the time, place, or specific individuals who purportedly made the misrepresentations." *Town of Belhaven v. Pantego Creek, LLC*, 2016 N.C. App. LEXIS 1164, at *15, 793 S.E.2d 711, 718 (2016).

75. Here, Plaintiffs have alleged the necessary elements of a claim for actual fraud with the requisite particularity. Plaintiffs' allegations state that Amory, on four occasions in the fall of 2017, made misrepresentations to Sasser that overpayments by the Bank to ACTS were "mistakes" when they were actually part of an intentional scheme to defraud the bank. (ECF No. 78, at ¶¶ 53–77.) Furthermore, the allegations detail that Amory's false representations were intended to mislead

Sasser into wiring the Bank's overpayments back to the owners of the Georgia LLC, which Sasser in fact did on three occasions. (*Id.*) Lastly, the allegations state that as a result of Amory's intentional misrepresentations and failure to disclose the overpayment scheme to CMI and ACTS, the companies were forced to spend time and resources investigating what went on to protect CMI and ACTS.

76.     Contrary to Amory's argument, Plaintiffs have alleged both reliance and damages. First, the allegation that Sasser in fact wired overpayments back to the LLC after Amory misrepresented to Sasser that the overpayments were "mistakes" is sufficient to show that Sasser relied on Amory's false statements. *See Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 481, 593 S.E.2d 595, 599 (2004) (stating that the element of reliance can be inferred from allegations that the plaintiff was actually deceived by and acted upon the misleading statements). Lastly, Plaintiffs identified the specific ways that Amory's fraudulent acts caused damage to them: CMI and ACTS "were forced . . . to expend time and resources [(over $25,000)] . . . to investigate and document the [fraudulent overpayment scheme], and to negotiate agreements for the winding up the Macon CBOC project and all associated agreements." (ECF No. 78, at ¶¶ 76, 118.) This is a sufficient allegation of damages, as plaintiffs in North Carolina have a duty to mitigate their damages and may recover as damages reasonable mitigation expenses. *Smith v. Martin*, 124 N.C. App. 592, 600–02, 478 S.E.2d 228, 233–34 (1996) (noting that "[a] plaintiff has the duty to avoid or minimize the consequences of the defendant's wrong[,]" and

concluding that the trial court did not err in awarding the plaintiff reasonable mitigation expenses).

77. In conclusion, Amory's motion to dismiss Plaintiffs' actual fraud claim should be DENIED.

### E. Unfair or Deceptive Trade Practices

78. In their fifth claim for relief, Plaintiffs allege that Amory misappropriated CMI's trade secrets "in order to compete unfairly against Plaintiffs" in violation of the UDTPA. (ECF No. 78, at ¶ 120.) Plaintiffs argue that since they "have sufficiently stated a claim for misappropriation of trade secrets, . . . Plaintiffs have sufficiently stated a claim for a UDTP[A] violation." (ECF No. 91, at p. 21.) Plaintiffs are incorrect. To state a claim for violation of the UDTPA, a plaintiff must show that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711. While a claim for misappropriation of trade secrets can support a claim for violation of the UDTPA, it must meet all three of the elements of an unfair trade practices claim. *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172, 423 S.E.2d 324, 326 (1992) ("If the violation of the Trade Secrets Protection Act satisfies [the] three prong test, it would be a violation of [G.S.] § 75-1.1."). Accordingly, the Court must decide whether Plaintiffs have alleged the three elements of the claim.

79. The Court concludes that Plaintiffs' allegations that Amory misappropriated trade secrets sufficiently states an unfair or deceptive act. In

addition, Amory does not contend that Plaintiffs fail to allege an injury. Instead, Amory argues that Plaintiffs have failed to state a claim for violation of the UDTPA because they do not allege Amory or BridgePoint is competing with Plaintiffs. (ECF No. 90, at p. 20.) The Court interprets this as an argument that Plaintiffs have not alleged facts supporting an allegation that Amory's misappropriation of trade secrets is "in or affecting commerce."

80. In the Amended Complaint, Plaintiffs allege that "Amory's violation of [the UDTPA] was in or affecting commerce." (ECF No. 78, at ¶ 122.) However, the Court is not required to accept this conclusory allegation where it is not otherwise supported by allegations of fact. *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). Plaintiffs allege that Amory is "using Plaintiffs' confidential and trade secret information to compete unfairly against Plaintiffs," (*id.* at ¶ 109), but don't allege facts regarding how Amory is competing with them. Plaintiffs don't allege that Amory has disclosed the trade secrets to his new employer, BridgePoint. There also is no allegation that Amory has used any trade secrets to prepare or submit proposals to the VA for projects on which Plaintiffs are bidding, nor that BridgePoint has suddenly started bidding on VA projects or otherwise soliciting the VA. Plaintiffs also have not alleged that Amory or BridgePoint has interfered with relationships between Plaintiffs and the VA or between Plaintiffs and their employees. These types of allegations are usually

present in cases in which an employer makes a claim for violation of the UDTPA based, at least in part, on a former employee's misappropriation of trade secrets.[3]

81. Elsewhere in the Amended Complaint, Plaintiffs seemingly undercut their allegation that Amory is actually using CMI's trade secrets to compete with Plaintiff, alleging instead that "with the information Amory acquired . . . BridgePoint . . . *could* begin to unfairly compete with Plaintiffs immediately." (*Id.* at ¶ 90; *see also* ¶ 12 ("Plaintiffs are informed and believe that Amory is *preparing* to cause Plaintiffs millions of dollars in damages by using their own trade secrets and confidential information to compete unfairly against them."); ¶ 87 ("*If* Amory is allowed to take the trade secrets he has stolen and deliver them to BridgePoint or another of Plaintiffs' competitors, thus allowing the competitor to immediately compete against CMI for VA CBOC projects, Plaintiffs will suffer irreparable harm.") (emphasis added to each quote).)

---

[3] *See e.g., Southern Fastening Sys. v. Grabber Constr. Prods.*, 2015 NCBC LEXIS 42, at *7–8, 29 (N.C. Super. Ct. Apr. 28, 2015) (plaintiff's UDTPA claim survived a motion to dismiss where the plaintiff sufficiently alleged a misappropriation of trade secrets claim, including allegations that defendant had contacted over 40 of the plaintiff's customers and that 17 of the plaintiff's former customers had either reduced or stopped doing business with plaintiff); *Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 55, at * 8–9, 31–32 (N.C. Super. Ct. June 26, 2017) (refusing to dismiss plaintiff's UDTPA claim where plaintiff alleged that defendant was working for a competitor and that defendant was soliciting business from customers of plaintiff); *Bldg. Ctr., Inc.,* 2016 NCBC LEXIS 79, at *30 (dismissal of plaintiff's claim for violation of UDTPA denied where plaintiff alleged that defendant-competitor hired the plaintiff's salespersons and solicited plaintiff's customers to take their business); *Window Gang Ventures, Corp. v. Salinas*, 2019 NCBC LEXIS 24, at *5–6, 55 (N.C. Super. Ct. Apr. 2, 2019) (plaintiff's UDTPA claim survived a motion to dismiss where plaintiff alleged that the defendant launched a competing business utilizing the plaintiff's customer lists, phone numbers, and trade secrets and that the defendant "intentionally diverted plaintiff's customers and revenue" to the new business).

82.     In determining what constitutes unfair or deceptive conduct "in or affecting commerce," the Supreme Court of North Carolina has held that the UDTPA's provisions apply to "interactions between market participants," but not to conduct that is "contained solely within a single business." *White*, 364 N.C. at 53, 691 S.E.2d at 680.  Therefore, where "the unfairness of [a defendant's] conduct [does] not occur in his dealings with other market participants[,]" the defendant's conduct is not in or affecting commerce and is outside the purview of the UDTPA. *Alexander v. Alexander*, 2016 N.C. App. LEXIS 1252, at *10, 792 S.E.2d 901, 905 (2016) (quoting *White*, 364 N.C. at 54, 691 S.E.2d at 680 (quotations omitted)).  Plaintiffs allege that Amory acquired CMI's trade secrets without authorization and is using them to compete, but do not allege additional specific facts showing that Amory has used or disclosed the trade secrets in a way that creates an "interaction between market participants," that would support the allegation that Amory's wrongful conduct is "in or affecting commerce and not merely "contained solely within a single business." *White*, 364 N.C. at 53, 691 S.E.2d at 680.

83.     Nevertheless, North Carolina is a notice pleading state, and

> A complaint sufficiently states a claim upon which relief can be granted when it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and by using the rules provided for obtaining pretrial discovery to get any additional information he may need to prepare for trial.

*Spoor v. Barth*, 811 S.E.2d 609, 612, 2018 N.C. App. LEXIS 93, at *6 (2018).  "The system of notice pleading affords a sufficiently liberal construction of complaints so

that few fail to survive a motion to dismiss." *Wray v. City of Greensboro*, 370 N.C. 41, 46, 802 S.E.2d 894, 898 (2017) (quoting *Ladd v. Estate of Kellenberger*, 314 N.C. 477, 481, 334 S.E.2d 751, 755 (1985)). Here, Plaintiffs have alleged that Amory is using CMI's trade secrets to compete, albeit without specific explanation of such competition, and the Court must reluctantly conclude that the allegation is barely sufficient to provide Amory with sufficient notice of the nature of the claim to withstand Amory's motion to dismiss. Accordingly, Amory's motion to dismiss Plaintiffs' claim for violation of the UDTPA should be DENIED.

### F. Computer Trespass

84. In their sixth claim for relief, Plaintiffs assert that Amory violated G.S. § 14-458, and seek to impose civil liability against him. G.S. § 14-458 governs the crime of computer trespass. According to Plaintiffs, Amory committed a computer trespass by "ma[king] or caus[ing] to be made an unauthorized copy of computer data belonging to Plaintiffs and stored in the Box Account owned by Plaintiffs." (*Id.* at ¶ 127.) In so doing, Plaintiffs assert "Amory used his company computer and the Box Account in a manner exceeding the right or permission granted to him by Plaintiffs." (*Id.* at ¶ 128.) Plaintiffs further allege that they've "sustained substantial damage as a result of Amory's computer trespass."

85. Amory argues that Plaintiffs fail to allege a claim because they (1) do not have a cause of action under § 14-458 because they do not allege they suffered injury to their "property or person"; (2) fail to identify their damages with reasonable certainty; (3) have not shown that Amory was "without authority" to access the Box

Account files; and (4) do not identify any company policy or agreement that prohibited Amory from downloading the Box Account files. (ECF No. 90, at pp. 22–25.)

86.     Under G.S. § 14-458(c), "[a]ny person whose property or person is injured by reason of a [computer trespass] may sue for and recover any damages sustained and the costs of the suit pursuant to G.S. 1-539.2A." Property, as used in the statute, means "financial instruments, information, including electronically processed or produced data, and computer software and computer programs in either machine or human readable form, and any other tangible or intangible item of value." G.S. § 14-453(8). Relevant here, a computer trespass includes the unlawful use of a computer or computer network without authority and with the intent to "[m]ake or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network." G.S. § 14-458(a)(5). "[A] person is 'without authority' when [ ] the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]" G.S. § 14-458(a).

87.     There is very little guidance from North Carolina courts on how a civil claim for computer trespass should be analyzed at the 12(b)(6) stage. Nevertheless, the Court concludes that Plaintiffs have done enough here to state a claim for computer trespass. Plaintiffs allege that Amory's downloading of their computer data from the Box Account to his personal device(s) exceeded the right or permission granted to him by Plaintiffs and resulted in damage to them. *See Spirax Sarco, Inc.*

*v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 417–18 (E.D.N.C. Aug. 10, 2015) (stating that the plaintiff companies' allegations that "[the defendant] intentionally used his [company-issued] laptop to download vast quantities of computer files to his own media devices and Dropbox account, without authorization and . . . deleted vast quantities of computer files from [company-issued] laptop without authorization" were "sufficient to state a claim [for computer trespass] under North Carolina law"). These allegations put Amory on notice of his actions which are at issue, allow him to understand the nature of Plaintiffs' claim, and enable him to answer and prepare for trial. *Wake County v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014). Therefore, Amory's motion to dismiss Plaintiffs' computer trespass claim should be DENIED.

*G. Punitive Damages*

79.     In their seventh and final claim for relief, Plaintiffs allege a claim for punitive damages. (ECF No. 78, at ¶¶ 132–135.) Amory argues the claim should be dismissed because, *inter alia*, it was not pled with particularity.

80.     Punitive damages are recoverable "only if the claimant proves the defendant is liable for compensatory damages" and the aggravating factor of (1) fraud; (2) malice; or (3) willful or wanton conduct "was present and was related to the injury for which compensatory damages were awarded." G.S. § 1D-15. North Carolina Rule of Civil Procedure 9(k) requires a plaintiff to aver with particularity the aggravating factor that supports an award of punitive damages. N.C. R. Civ. P. 9(k). The particularity requirement is satisfied by allegations of "facts or elements showing the

aggravating circumstances which would justify the award of punitive damages." *Wiley v. L3 Communs. Vertex Aero., LLC*, 251 N.C. App. 354, 367, 795 S.E.2d 580, 590 (2016) (citation and quotations omitted).

81.     Here, Plaintiffs allege that "Amory's acts described [in the Amended Complaint]" were undertaken with personal ill will toward Plaintiffs, with intentional disregard of and indifference to their rights, and that he knew or should have known that his conduct was likely to cause damage or harm to them. The Amended Complaint alleges claims against Amory for constructive and actual fraud and misappropriation of trade secrets. Those claims have survived Amory's motion to dismiss, support a claim for compensatory damages, and allege facts or elements that show the potential presence of the aggravating factors of fraud and willful or wanton conduct. *See* G.S. § 66-154(c); *see also Collier v. Bryant*, 216 N.C. App. 419, 434, 719 S.E.2d 70, 82 (2011) ("[P]unitive damages can be awarded if either actual or constructive fraud is shown."). Thus, Amory's motion to dismiss Plaintiffs' punitive damages claim should be DENIED.

## III.    CONCLUSION

Therefore, it is ORDERED that:

1. Amory's motion to dismiss each Plaintiff's misappropriation of trade secrets claim related to their QuickBook files is DENIED. Amory's motion to dismiss CMI's misappropriation of trade secrets claim, with respect to the CMI Process and its component parts, is DENIED. To the extent CM, LLC, ACTS or ACTS Investments attempt to state a misappropriation of trade

secrets claim based on the CMI Process and its component parts, Amory's motion to dismiss is GRANTED.

2. Amory's motion to dismiss ACTS and ACTS Investments' breach of fiduciary duty and constructive fraud claims based on his misappropriation of their trade secrets is DENIED.

3. Amory's motion to dismiss ACTS' breach of fiduciary duty and constructive fraud claim based on his participation in the fraudulent overpayment scheme is DENIED. Amory's motion to dismiss ACTS' breach of fiduciary duty and constructive fraud claim based on his decision to resign shortly after receiving a $150,000 distribution is GRANTED. Amory's motion to dismiss ACTS' breach of fiduciary duty and constructive fraud claim based on his decision to give a promotion and raise to Patti King is GRANTED.

4. Amory's motion to dismiss CMI and CM, LLC's breach of fiduciary duty and constructive fraud claims is GRANTED.

5. Amory's motion to dismiss Plaintiffs' actual fraud claim is DENIED.

6. Amory's motion to dismiss Plaintiffs' Unfair or Deceptive Trade Practices Act claim is DENIED.

7. Amory's motion to dismiss Plaintiffs' Computer Trespass claim is DENIED.

8. Amory's motion to dismiss Plaintiffs' punitive damages claim is DENIED.

SO ORDERED, this the 17th day of May, 2019.


         /s/ Gregory P. McGuire
        Gregory P. McGuire
        Special Superior Court Judge for
        Complex Business Case